# MARYLAND REPORTS.

## JUNE TERM, A. D., 1861.

### JOSEPH O'NEAL and others, *vs.* THE VIRGINIA AND MARYLAND BRIDGE COMPANY AT SHEPHERDS TOWN.

A bridge over the Potomac river, and other property of a corporation for the erection of such bridge, lying within the limits of Maryland, is taxable in the county in which it is situated, under the Act of 1852, ch. 337, sec. 17, the principal office of the corporation, for the transaction of its business, not being within the limits of this State.

The property of a corporation was assessed, and entered on the assessors' books, in the name of the *"Potomac Bridge Company,"* whereas the true corporate name was, *"The Virginia and Maryland Bridge Company at Shepherds Town."* The corporation had knowledge of the assessment, and no reason was assigned for their not going before the commissioners to have the error, as to the name, corrected. HELD:

That in such a case equity cannot interfere in behalf of the corporation, and relieve them from the payment of the tax so assessed.

Taxes are laid for the support of government, and all property made liable for contribution to this object, ought to be embraced in assessments for that purpose.

Tax assessments ought not to be vacated, and property released altogether, because the public officers have not strictly followed the provisions of law, which are merely directory; assessments are not invalid if such directions are not complied with.

If the property owner omits to pursue the relief offered by the tax laws against the improper exercise of the taxing power, he cannot be relieved in equity, if at all, unless a strong case is presented.

1    v.18

In such case the property owner must show he has not been in default in availing of the means provided by the tax laws, and there must be something more than legal error assigned; facts must be presented appealing to the conscience of the court, to prevent wrong and injustice.

If the objection, as to the manner of making and returning the assessment, is merely technical, and goes to matter of form and not to substance, a court of equity ought not to interfere.

Substance, and not form, is to control the construction of legislative enactments prescribing a mode in which acts are to be done.

The tax laws require public notice to be given of the meeting of the commissioners to correct errors, &c., in assessments, and the laws and publication impute notice to all persons, whether they have actual information or not.

The tax laws authorise the commissioners to increase or abate valuations, and to exclude property improperly valued, and, where such remedy is afforded, a court of equity has no jurisdiction to make corrections.

APPEAL from the Equity side of the Circuit Court for Baltimore City.

This appeal is from an order making perpetual an injunction, granted upon a bill, filed on the 14th of December 1857, by the Appellee against the Appellants, the collector of the tax and the county commissioners of Washington county, for the years 1854 and 1855, restraining the defendants from selling certain property of the complainant, for the payment of the State and county taxes for those years.

The bill, answers, and admissions of fact, show, that the complainant was incorporated by an Act of Virginia, passed in January 1848, under the corporate name of "*The Virginia and Maryland Bridge Company at Shepherds Town;*" which law was assented to by the Act of Maryland of 1847, ch. 287, passed in March 1848, in which the name is recited as, "*The Maryland and Virginia Bridge Company.*" The company having been organized under these Acts, in July 1849, purchased from one Blackford, for $15,000, the public ferry and ferry rights, across the Potomac at Shepherdstown, with certain lands and improvements thereto annexed, situated on both sides of the river, viz : fourteen or fifteen acres of land in Wash-

O'Neal, *et al.*, *vs.* Va. & Md. Bridge Co.

ington county, Maryland, at the Maryland termination of the ferry, with a ferry house and other improvements thereon, and about a half or three-fourths of an acre of land on the Virginia side, in Jefferson county, with a warehouse thereon. Prior to the passage of the Act of 1852, ch. 337, providing for a general assessment of property in Maryland, this company constructed a bridge over said river, at said ferry, with the necessary roads to the same, at both abutments. This bridge was a wooden structure, covered, resting upon stone abutments on the shores, and stone piers in the river, and was built in such manner as not to obstruct the navigation of the river, if the same had been navigable, as before the construction of the Chesapeake and Ohio canal: and the total cost of the same, including the purchase of the ferry right, was $37,069.85.

The assessors, under the Act of 1852, ch. 337, assessed the property, and made the following entry upon the assessment book for Washington county, *"Potomac Bridge Company:—* Bridge opposite Shepherdstown, and 10 acres of land with building attached, $27,000,"* and in the assessment leger or book, made from the foregoing by the county commissioners, an account was opened headed thus: *"Bridge Company at Shepherdstown,* $27,000.*"* And this latter entry so remained till the 1st of October 1856, when it was changed by prefixing the words, *"Virginia and Maryland,"* and this change was made on that day by the clerk of the commissioners, upon an order of the board, for the purpose of proceeding against the complainant for the taxes for the years 1854 and 1855. No change was ever made in the entry upon the assessment book first above stated. The taxes for 1852 and 1853, were paid by the complainant on the 24th of February 1855, and the tax for 1853 was made out in the name of the *"Potomac Bridge Company."* The commissioners held their session under sec. 26th of the Act of 1852, ch. 337, in January 1853, in pursuance of regular notice given in the newspapers, for hearing and determining complaints and appeals of persons who felt themselves aggrieved by the valuation of the assessors under

said Act, and the complainant did not then appear with any appeal or complaint, or for any purpose.

The answers aver, that the complainant was fully aware of this assessment and valuation from the time it was made, and never objected to it or urged any exception whatever, until some two or three years afterwards, when they applied to the commissioners to have a change made, and to be relieved from taxation altogether; which is the same relief they are now asking, but which was refused. It was admitted that the application so referred to in the answers, was made sometime in 1856, and was not in the form of a regular proceeding by bill or petition, and no minute or record was made of the result by the commissioners or their clerk, but the whole proceedings were oral.

It was also admitted, that the assessment, aforesaid, includes the entire bridge of the complainant, (except so much of the abutment on the Virginia shore as may be beyond the limits of Maryland, as prescribed by the charter to Lord Baltimore,) and all the lands and improvements on the Maryland side of the river, but not the toll-house and other improvements on the Virginia shore, which are conceded to be within that State. That the office of business of the company is, and always has been, on the Virginia shore; that the officers of the company reside in Virginia, and two of its directors are appointed by that State; that the capital stock of the company consists of 727 shares at $50 per share, of which $10,000 are held by the State of Virginia, $5000 by a citizen of Pennsylvania, and the residue by citizens of Virginia; and that an annual report is made by the company to the Board of Public Works of that State in pursuance of the laws of Virginia.

It was further admitted, that the bridge of the complainant at Shepherdstown, is the only bridge over the Potomac, within the limits of Washington county, and that there is no other organised company for a bridge over that river in that county, beside the complainant; but that there is a bridge over that river at Berlin, in Frederick county, called "The Berlin and

O'Neal, *et al., vs.* Va. & Md. Bridge Co.

Potomac Bridge Company," erected under the Act of Maryland of 1847, ch. 197.

The grounds upon which this company claimed exemption from these taxes, are fully stated in the arguments of counsel, the opinion of this court, and the following opinion of the court below, (PERRY, J.,) delivered upon passing the decree making the injunction perpetual :

"In this case I have had much difficulty in determining the questions that have been made by the bill and answers. I will briefly give the opinion I entertain in the case. The complainant, by its Act of incorporation, is known by the name of 'The Virginia and Maryland Bridge Company.' It appears that the assessors for Washington county, appointed by virtue of the Act of 1852, ch. 337, made an assessment of property in these words: 'Potomac Bridge Company, Bridge opposite Shepherdstown, and 10 acres of land, with building attached, $27,000,' and that the commissioners, in what is called the assessment leger or book, opened an account headed: 'Bridge Company at Shepherdstown, $27,000,' which entry remained in that form, on said leger or book, up to the first of October 1856, when it was changed by prefixing the words, 'Virginia and Maryland.' By the Act of 1852, ch. 337, sec. 25, it was made the duty of the county commissioners, of the respective counties, to cause to be made, on or before the 1st day of March 1853, and on or before said day, annually thereafter, an alphabetical list of the owners of the property assessed by virtue of the Act, together with the amount of his, her or their assessments, respectively answering to his or her name; which said list was to be deposited in the offices of the clerks of the county commissioners, &c.; and it was made the duty of said clerks to keep the same in some conspicuous place, in his or their offices, for the inspection and perusal of any person or persons interested therein, without fee or reward. I indulge the belief, that the commissioners of Washington county discharged their duty and complied with the provisions of the law to which I have referred, and that

upon this presumption, there would have been found in the office an alphabetical list of the owners assessed, answering to his or her name, at the time required by law, as returned by the assessors.

"The 21st section of the Act of 1852, makes it the duty of the assessors, in case they could not discover the owners of any property within their assessment district, to return the same as the property of some person unknown. The assessors did not value the property assessed in this case, as the property of some person unknown, but assessed it as the property of the 'Potomac Bridge Company.' I have referred to these sections of the Act to show, that the name of the owner of property assessed should appear in the return and alphabetical list, for inspection by the owner; this was no doubt wisely required, so that such owner, or other person interested, might know in what way the conduct of the assessors affected them. The name of the owner was important to enable him or her to know how they were assessed, so that it could have been seen, and if unjustly imposed, an application could have been made for redress, in the mode pointed out, to the commissioners of the county.

"There is nothing in this case to show that the name of 'The Virginia and Maryland Bridge Company' was returned by the assessors, or was found in the alphabetical list, or that it was property held by any person unknown to the assessors or commissioners. Supposing the law intended that the name of the owners should appear, and that an examination or inspection of the list was a right of such owner, can it, when this requirement of the law has been disregarded, be supposed, the commissioners could legally assess the property of one not named or returned as unknown? This list, or return, was deemed necessary. Indeed it is an express obligation of the assessors and county commissioners to have the name returned and alphabetical list made out, as the means of discovering the property and extent of the assessment, so that the commissioners could be appealed to, to make such abatement, or to exclude entirely property from assessment, &c.

O'Neal, *et al.*, *vs.* Va. & Md. Bridge Co.

"It may be thought that the description of the property, 'Bridge opposite Shepherdstown,' would gratify the requirements of the law, there being but one bridge of that kind in the limits of the county—that there has been a substantial compliance with the law—that it shows the property intended to be assessed, and the corporation, who is the owner. In this I do not agree. It is, as a general rule, not required to give the name of a corporation with as much certainty as in the case of individuals; that in grants to and from corporations courts will sustain them, though there is a variation in words and syllables. There is a difference between the alteration of a letter or transposition of a word between the name of a natural person and a name of a corporation. It makes entirely another name of the person in the one case, while the name of a corporation frequently consists of several descriptive words, and the transposition of them, or interpolation or omission of them, may make an essential difference in the sense. The true rule has been stated to be, that, in grants and conveyances, the name must be the same in substance as the true name, but need not be so in words and syllables. *Angell & Ames on Corp.*, sec. 99.

"I can see nothing by which the true name in this case can be seen or known, unless it be arrived at on account of the property taxed. If it were a case in which there was a transposition of the words of the name, or an omission of some of them, a doubt might exist under such circumstances. But the corporate name of the complainant is, 'The Virginia and Maryland Bridge Company,' and in no place can such a name be seen in the books of the commissioners, except in the year 1856. I think it cannot be doubted, that if the assessment, prior to October 1856, was not valid, the action of the county commissioners in that year could not make it so. 'The Virginia and Maryland Bridge Company' had a right to be heard, and there being no such owner named on the books of the commissioners, the imposition of the tax was without the authority of law, and I know of no power in them by which

they can make valid an improper assessment of property, for such period as is claimed in this case. The description of the property in the return of the assessors, does not furnish the commissioners with the name of the owner. At least it seems not to have accomplished that purpose in the case under consideration, for that body departed from the name as given by them and contented itself with the name of "Bridge Company at Shepherdstown," such name on the alphabetical list was not its true name, and possibly nothing short of an examination of the assessors' entire return would enable them to know their property was assessed. If the proceeding of the assessors and commissioners had been conducted in such a manner as to show, substantially, the name of the corporation, it may be well questioned, whether this court would have jurisdiction, and whether the only remedy of the complainant was not that which is provided for by the Act of 1852: an application to the county commissioners and an appeal to the Court of Appeals. (See *Osborn vs. The Inhabitants of Danvers*, 6 *Pick.*, 99. *Methodist Protestant Church vs. The Mayor and City Council of Baltimore*, 6 *Gill*, 391.) Assuming, however, that the proceedings of the assessors and commissioners had been regular, by giving the true corporate name, and making, as required by law, the alphabetical list, it is still urged, that the commissioners do not possess the power to tax the property of that corporation. I cannot forbear being influenced by the provisions of the Act of 1852, sec. 17, which provides, that the stock of a turnpike, railroad or other improvement corporation, shall be valued at the place where its principal office for the transaction of business is established, if the office be within the limits of the State, and if not, then the assessable property of such corporation shall be valued in the county in which it is situated. When I look at the plain and obvious design of the Legislature, to tax the entire property of the State and to make all that is liable to assessment contribute to the common burden, together with this section of the Act, no doubt exists in my mind that such is liable to taxation. The right of

taxation is never presumed to be surrendered by the sovereign power, and such surrender is never understood to be made, unless it be the result of express terms or necessary inference, and by the 13th Article of the Bill of Rights, the Legislature can impose no tax upon any particular property, which is not legally borne by every species of property in the State in proportion to its value. *Mayor & City Council of Baltimore vs. B. & Ohio R. R. Co.*, 6 *Gill*, 290. It is not a case in which they should stand by and see their property illegally exposed to public sale, and then force the purchaser to bring his ejectment to gain possession. In such a case a court of equity will interpose, (*Holland vs. Mayor & C. C. of Balto.*, et al., 11 *Md. Rep.*, 187,) by injunction, in behalf of the complainant.

"If the assessors and commissioners had complied with the law, the only remedy of the complainant for relief was, by an application to the latter body for re-valuation, or such change as is contemplated by the Act of 1852, and should their application be rejected and the party consider itself aggrieved, by an appeal to the Court of Appeals, and in no other mode could relief be had, as such is the law as announced in the case of the *Methodist Protestant Church vs. The Mayor and City Council of Baltimore,* and the case of *Osborn vs. The Inhabitants of Danvers.* If the corporation, when taxed, should apply to the commissioners, and show to that body that their property should not have been assessed, then it was certainly competent for them to have appealed to the highest tribunal of the State to have determined that question. They have that remedy, and it is not in their province to abandon it and resort to the power of this court for its equitable jurisdiction, which is always upon the notion that he is without remedy at law."

The cause was argued before LE GRAND, C. J., TUCK and BARTOL, J.

*A. K. Syester*, for the appellants, argued at length the following points:

2      v.18

O'Neal, *et al.*, *vs.* Va. & Md. Bridge Co.

1st. That the assessment, as made by the assessors in the first instance, was sufficiently certain to enable the county commissioners to levy, and the collectors to collect, the taxes imposed upon the property of the appellee; and although the appellee may not have been properly styled in the return books of the assessors, still it was sufficiently designated to inform every person acquainted with or interested in its property, of the party intended to be assessed therewith, and if so, that was all that was required. *Act of* 1852, *ch.* 337. 2 *Gill,* 487, *State vs. Mayhew.*

2nd. That whatever lapse may have been made by the assessors in the style of the appellee in the return book, the identification is rendered sufficiently certain by the county commissioners, when they, upon the return of the assessment to them, entered the assessment of the property of the appellee in their assessment leger to the "Bridge Company at Shepherdstown," there being no bridge company other than the appellee to answer such a description.

3rd. That whether the form of the entry made by the assessors in their return book, or made by the commissioners in their leger, were sufficient or not, still, it is insisted, the county commissioners had ample power to correct any error that may have been made in the entries, in the style of the owner of the property, and that the subsequent action of the commissioners in prefixing the proper corporate name of the appellee to the imperfect designation of the owner, on their books, was legal and binding on the appellee, as much so as if the assessors, themselves, had so correctly styled it by its proper name in the beginning. *Act* of 1852, *ch.* 337, *sec.* 27.

4th. That the appellee, however, is concluded by its own solemn acts of recognition of the correctness and legality of the assessment.

5th. That the objection to the entries on the assessment book, forms no ground for relief in a court of equity, where substance and not technical formality is regarded. The

whole case is destitute of equity. 10 *G. & J.*, 358, *Fowler vs. Lee.*

6th. That the compact of 1785 has no application to the case, and therefore imposes no restriction on the authorities of this State, in levying a fair and equal tax on all the property that may be found within the chartered limits of the State, whether that property belongs to citizens of Virginia or not. 2 *Bland*, 99, *Binney's case.*

7th. That the power to levy taxes to support the goverment is never presumed to be waived or renounced by the Legislature, but it requires unequivocal language expressive of such intent; and as neither the compact of 1785, nor the Act of 1847, makes any provision upon the subject of taxation, it therefore follows, that the Legislature of this State has not divested itself of the taxing power over property situated as that of the appellee. 6 *Gill*, 288, *City of Balt. vs. Rail Road Co.* 4 *Pet.*, 514, *Providence Bank vs. Billings, et al.* 11 *Pet.*, 420, *Charles River Bridge Co. vs. Warren Bridge.* 10 *How.*, 376, *Phil. Wil. R. R. Co., vs. State of Maryland.*

8th. That the county commissioners had, and still have, exclusive control and jurisdiction of the subject matter of complaint in this case, and were and are competent, and they only competent, to extend to the appellee the appropriate relief, if it be entitled to any; and application having been made to that body for the same relief now asked, and being refused, and the appellee failing to pursue its remedy as provided by law, it is effectually concluded, and a court of equity can take no jurisdiction in the premises. *Act of* 1852, *ch.* 337, *secs.* 26, 31, 32, 35. 6 *G. & J.*, 312, *Gott & Wilson vs. Carr.* 6 *Gill*, 391, *Methodist Church vs. City of Balt.* 39 *Eng. Law & Eq. Rep.*, 553, *Newry Railway Co., vs. Ulster Railway Co.* 26 *Wend.*, 132, *City of Brooklyn vs. Meserole.*

*D. Weisel*, and *J. R. Tucker*, (Attorney General of Virginia,) for the appellee, argued the following points, the argument of

*Mr. Tucker* being confined to the points relating to the inter-state rights of Maryland and Virginia.

1st. That the appellee was not assessed under the Act of 1852, ch. 337, and agreeably to its provisions, and the other Acts of Assembly in force in such cases, the property claimed to have been assessed, not having been assessed in the name of the appellee. *Acts of* 1841, *ch.* 23, *secs.* 9, 22, 23, 27, and 1852, *ch.* 337, *secs.* 21, 25, 29. These laws require that the name of the owner, when known, must be returned by the assessors, property must be assessed in the *names* of the *owners* thereof respectively, and if an owner cannot be found, or is unknown, the return must show it to be the property of some person *unknown.* This corporation had a charter name which ought to have been found out by the assessors, but it was not so done, and the property was returned as, and assessed in the name of the "Potomac Bridge Company;" a name by which it could neither sue nor be sued. Not being assessed in its proper name, the corporation was not bound to make an appeal to the commissioners to have the assessment changed, nor had the commissioners any power, after the assessment was made, to usurp the authority of the assessors and change the *name* so as to make it the name of this corporation.

2nd. That the appellee is a Maryland corporation, and its capital stock only is liable to taxation, whether owned by residents or non-residents of this State, the laws and decisions of Maryland sufficiently pointing out the mode of assessing the stock and enforcing the payment of the tax; and the shares represent all the property of the company. *Acts of* 1841, *ch.* 23, *secs.* 1, 16, 17, 18; and 1852, *ch.* 337, *secs.* 1, 17, 18. 12 *G. & J.,* 117, *Tax Cases.* 2 *Gill,* 494, 499, *State vs. Mayhew.* 6 *Gill,* 295, 296, 297, *City of Balt. vs. Railroad Co.* 5 *Gill,* 236, *Gordon vs. City of Balt. Bill of Rights, Art.* 13.

3rd. That the bridge itself is not liable to taxation, being a highway, any more than a turnpike road, or the *corpus* of a canal, or the public ferry it superseded. It is not a portion of

the assessable property of the corporation, the Potomac river, itself, being a public navigable river. *Act of* 1768, *ch.* 5. 1 *Harg. Tracts, ch.* 3, *page* 9 to 10. *Shultes on Aquat. Rights,* 134, in 24 *Law Lib. Angell on Water Courses,* 201 to 207. 1 *Showers,* 255, *Payne vs. Partrige.* 5 *H. & J.,* 195, *Browne vs. Kennedy.* 1 *Rand.,* 417, *Hayes vs. Bowman.* 1 *Rand.,* 33, *Mead vs. Haynes.*

4th. That under the compact with Virginia, of 1785, ch. 1, sec. 1, the bridge, or at least one-half of it, is Virginia property, or property attached to the Virginia shore, and exempt from the taxing power of Maryland; that by that compact, Maryland surrendered in favor of Virginia her power to tax the property within her chartered limits on that shore, and all improvements projected therefrom, out, into or over the river, so as not to interfere with its navigation.

On this point *Mr. Tucker* said, there is reason to believe the received opinion as to the construction of Lord Baltimore's charter for Maryland, is not the correct one; and produced a copy of an *original charter* translated by *Tomlyn,* in which the description of the southern boundary differs in some material points from that usually received as the original charter in Maryland, and showing that the River Potomac was within the limits of Virginia. He further stated, that for more than eighty years, Virginia had exercised jurisdiction over the Potomac River by granting *ferry privileges,* establishing *ferries* and ports of entry, and making pilot laws; whilst there was no evidence of the exercise of any power on the part of Maryland to *grant ferry privileges.* He referred to *Rev. Code of Va. of* 1819, *pages* 243, 343. *Cons. of Va. of* 1776, *sec.* 21. He further argued that the taxing power may be relinquished by necessary implication, as well as by express terms, and that it was so relinquished in reference to the property now in question, 1st, by the compact of 1785, and 2nd, by the incorporation Act of 1847. That the compact should be construed liberally, he cited *Vattel,* ch. 22, and pages 247 to 270, and also referred to the case of *Handly's lessee vs. Anthony,* 5 *Wheat.,* 375.

5th. That by the tax laws of Maryland the assessors could only assess property in Maryland, and liable to taxation; not property exempt from taxation, or lying beyond the taxing limits of the State; and if such property (entitled to exemption) were assessed by them, an appeal to county commissioners was not the only or exclusive relief, (Act of 1852, ch. 337, sec. 26,) but a court of equity can be resorted to for the purpose, and its restraining powers invoked, when a sale of property for taxes thus illegally imposed, is attempted. Especially so, when the property assessed lies beyond the jurisdiction of the State, and the attempt is to sell property in the State for taxes levied upon such assessment. 11 *Md. Rep.*, 186, *Holland vs. Mayor & C. C. of Balt.* 3 *Gill*, 23, *Howell vs. The State.*

6th. That the appeals allowed to the county commissioners, and thence to the Court of Appeals, took cognizance only of the complaints made by persons who were aggrieved by the valuation, by the assessors, of property *liable to be assessed,* and were not given to *relieve persons from taxation on property not liable to be assessed and taxed.* Otherwise, by a failure to appeal, property expressly exempt from taxation by law, could be brought under taxation; or property in *another State* could be subject to taxes *in Maryland,* by first assessing it, and then by levying and selling any property which the owner might have contiguous thereto, or otherwise, in Maryland. Besides, the time of appeal is specified in the tax laws of Maryland, and an appeal would lie at no other time; and any application at any other time for relief, would be nugatory, or if made and entertained by the commissioners, would be without their jurisdiction, and such action or proceedings would not preclude a resort to a court of chancery for redress for the same matter or cause of complaint; nor would payment of illegal taxes at one time, bind the party, thus paying them, to a continuance of their payment without remedy. 6. *Gill*, 402, 403, *Methodist Church vs. City of Baltimore.*

*R. H. Alvey*, for the appellants, in reply.

The leading propositions of this case are reducible to two:

1. Whether the property assessed and levied on, under the facts and circumstances of this case, is legally exempt from taxation?

2. Whether a court of equity can properly exercise jurisdiction to relieve the appellee from the payment of the taxes, assessed and attempted to be enforced by the proper officers, either because of an exemption of the property from taxation, or because of irregularities and informalities committed in the assessment? And—

1. Is the property exempt from taxation? If so, it is incumbent upon the appellee to establish it clearly and beyond doubt. —It is contended, for the appellee, that the property assessed is not liable to taxation, upon three distinct grounds:

1. That, under the compact of 1785, this State relinquished her taxing power over property situated as is the bridge of the appellee.

2. That the bridge itself, being a highway, is not subject to taxation,—not being of that species of property legally assessable.

3. That the appellee being a Maryland corporation, or corporation authorised by the concurrent legislation of the two States of Virginia and Maryland, its capital stock *only*, and not its property, is taxable.

A great deal of the argument for the appellee has been predicated of the territorial rights and jurisdiction of Virginia, in and over the Potomac river. It is supposed that Virginia has, at least, an equal and a concurrent right and jurisdiction with Maryland, over the Potomac. But, whatever controversy formerly existed between the two States, as to their respective chartered claims to territory and jurisdiction, it has long since been adjusted in a spirit of amity. The charter of Maryland defines the southern boundary to be, from "the first fountain of the river Potomac, thence verging towards the south unto the further bank of the said river, and following the same on the

west and south, unto a certain place called Cinquack, *situate* near the mouth of the said river," &c.   "To the full extent of this call for the right bank of the Potomac, Maryland *has always held;* and under that holding, all the islands in the river have been granted by the patents issuing from the land office, or under legislative enactments, or titles derived from this State; and the whole of the bed of the river, above tide, it is believed, *has always been admitted to be rightfully parcel of the territory of Maryland.*" *Binney's case*, 2 *Bland*, 127. And to this full extent has Virginia, by her Constitution of 1776, acknowledged the rights and claims of Maryland; for by that Constitution are renounced and confirmed to the State of Maryland, *"all the territory contained within its charter, with all the rights of property, jurisdiction and government, and all other rights whatsoever, which may at any time heretofore have been claimed by Virginia."* Seeing, then, that the entire Potomac, "unto the further bank of the said river," is within the chartered limits of Maryland, and that she has always claimed and exercised jurisdiction over it, and that Virginia has acknowledged and confirmed the right, if the property sought to be taxed is located on the Maryland side of this clearly established boundary, there can be no question of mere *territorial* jurisdiction for discussion here.   And hence it is, that so much of the discussion on the part of the appellee, has been wholly inapplicable and foreign to the case, as presented by the record; for it is expressly *admitted,* in the agreed statement of facts, that the assessment was only upon the property of the appellee, found within the chartered limits of Maryland. No property beyond it has ever been interfered with, nor is hat the complaint here.   The complaint is, that the bridge structure over the Potomac river, and the land of the appellee on the Maryland side of the river, have been assessed.   There being, then, no question of mere boundary or territorial jurisdiction, the question is one of *exemption* by some competent Act of Maryland.   This exemption is supposed to be secured to the appellee by the compact of 1785.   Upon the true and proper construction of this compact, I contend:

1. That it does not extend to that portion of the Potomac river over which this bridge is erected, or to any portion of it above tide water; and—

2. That, were it even construed to extend to the entire river, as well above as below tide-water, there is no clause or provision in the compact contemplating the exemption claimed.

That it does not extend to the river above tide-water, is manifest from its various provisions, all applying only to waters that were then, and by nature, navigable, and regulating the terms upon which the navigation was to be enjoyed and conducted by the citizens of the two States. This compact is to be construed according to the intention of the parties at the time it was made, and we are to arrive at that intention by ascertaining the objects and subject matter to which its provisions were applicable at the time. We know that the Potomac river, above tide-water, was not, in 1785, an object of such provisions as we find in this compact. It could then and can now, in the nature of things, have no application to the river above tide-water. If it be construed to extend to the river above tide, to what extent will it be applied? Will it be said that it applies to the entire river, to its "first fountain?" And if so, to the fountain of which branch, the northern or southern? It has been settled by judicial construction of this compact, that it does not apply to the river Potomac higher than the flow of the tide. *Binney's case,* 2 *Bland,* 125 and 126.

But if the compact were supposed to apply to the river above tide-water, in what clause or article of it is found the exemption claimed? It must be admitted, that it is not expressly granted; and from what is it necessarily implied?

Did this State intend, by that compact, to give up and abandon any of her domain or territorial rights? The compact is confined exclusively to matters of jurisdiction and navigation; "it leaves the territorial rights of the parties untouched." 2 *Bland,* 127. It is but "a series of commercial regulations, constituting a treaty of commerce, predicated upon the basis of

free and equal rights in the navigation of these rivers, to be maintained for their common benefit, by their common efforts, and at their joint expense, and securing these in a manner eminently calculated to promote and establish a harmonious and beneficial intercourse." *McMahon's History of Md.*, 61. Such being the character of this compact, upon the adoption of the Federal Constitution, which devolved upon Congress the exclusive power of regulating commerce with foreign nations, and among the several States, its provisions were superseded; for the power of regulating commerce extends to the regulation of navigation, and to every species of commercial intercourse between the United States and foreign nations, and among the several States, and is exclusively vested in Congress, and no part of it can be exercised by a State. *Gibbons, vs. Ogden,* 9 *Wheat.*, 1.

But whatever provisions of the compact may still be of force, if any, there is not the least reason to suppose, that it was ever the design to renounce the taxing power, so essential to the State. "It resides in government *as a part of itself,* and need not be *reserved, when property of any description, or the right to use it in any manner,* is granted to individuals or corporate bodies." *Providence Bank vs. Billings, et al.*, 4 *Pet.*, 562. There is no express exemption, nor is there any by necessary implication under this compact. Why then should this corporation be exempted from such taxes as every citizen, holding property in the State, may be required to pay? It was said by the Supreme court of the United States, in the case of the *Phil. & Wilm. R. R. Co., vs. The State of Maryland,* 10 *How.,* 393, of a corporation, seeking an exemption from taxation by implication, as in this case, that "there is no provision in the law exempting its stocks or its property, real or personal, from taxation. And certainly there is no reason why the property of a corporation should be presumed to be exempted, or should not bear its share of the necessary public burdens, as well as the property of individuals. This court, on several occasions has held, that the taxing power of a State is *never presumed*

*to be relinquished,* unless the intention to relinquish *is declared in clear and unambiguous terms.*" *Charles River Bridge vs. Warren Bridge,* 11 *Pet.,* 422. *Mayor & C. C. of Balt., vs. Balt. & Ohio R. R. Co.,* 6 *Gill,* 288. *Mayor, &c., of Balt., vs. Board of Police,* 15 *Md. Rep.,* 376.

Nor does the fact that the State of Virginia holds a portion of the stock of the corporation entitle the appellee to a more favorable consideration. The State is to be regarded as simply a stockholder, with no greater privileges than individuals owning the stock. She can urge no claim to exemption upon any grounds of comity, because we are not dealing with her in her sovereign capacity. "Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted." *Bank of U. S., vs. Planters' Bank of Georgia,* 9 *Wheat.,* 907. *Louisville Railroad Co., vs. Letson,* 2 *How.,* 497. *Curran vs. State of Ark.,* 15 *How.,* 309.

But how is it that the appellee can claim exemption, under the compact of 1785, in the name and behalf of Virginia, when it is alleged and insisted that it is a Maryland corporation? If it be a Maryland corporation there is an end of the claim to exemption. For it is the body corporate with which we have to deal, and not with the individuals composing it, and whether they are citizens of Virginia or Maryland, is immaterial.

The next ground upon which exemption is claimed for the bridge is, that, being a highway, it is not taxable. This objection to the assessment turns upon a very simple question; and that is, whether the bridge structure is property, either real or personal? For if it be of either kind, it is liable. The Act of 1841, ch. 23, sec. 1, provides "that all real and personal property in this State," and after specifying the various descriptions, then further provides, "and all other property of every description whatsoever, shall be valued agreeably to the directions of this Act, and shall be chargeable according to such valuation, with the public assessment;" and by the Act of

O'Neal, *et al.*, *vs.* Va. & Md. Bridge Co.

1852, ch. 337, it was enacted that all property, of every kind and description, "now by law liable to be valued and assessed, and chargeable with taxes in this State," should be valued and charged. The bridge is certainly property. It is profitable property, it yields the company its tolls. Its value is represented by the stock of the company. It is liable to be taxed upon the same principle that the bed of a railroad, its rails, and other structures, are assessed. The decisions are express, that assessments on such structures are proper. *The Tax cases,* 12 *Gill & John.,* 117. *The P. W. & B. Railroad Co., vs. Bayless,* 2 *Gill,* 355. *The Phil. & Wilm. R. R. Co., vs. Maryland,* 10 *How.,* 376.

Nor is the third ground of objection to the assessment better founded. It is agreed, that nearly all the stockholders are non-residents of this State; that all the officers of the corporation reside in the State of Virginia; and that the principal and only office of business of the company, is in the latter State. Nor is it pretended, that any part of the capital stock, as such, has been assessed by the authorities of this State. Either the stock in the hands of the holders, or the property of the corporation is to be assessed; and, as in a case like this, where the principal and only office of business of turnpike, railroad, canal, or other improvement corporations, is beyond the limits of the State, and therefore, not subject to its jurisdiction, the Act of 1852, ch. 337, sec. 17, provides, that "*the assessable property of such corporations shall be valued and assessed, in the county or counties in which it is situated.*" It is very manifest, that the only tax that can be enforced against this corporation is that upon the assessment of its property found within the State, and not of the stock in the hands of unknown stockholders residing out of this State.

The second leading question presented, is one of jurisdiction. No fraud or surprise is alleged or pretended. The application is one, simply, to have revised the acts and judgment of an inferior tribunal of special and limited powers and jurisdiction. The mode of proceeding by these inferior officials,

the assessors and commissioners, is particularly prescribed; and a particular mode pointed out by statute, to those thinking themselves aggrieved, by which they can obtain redress. There is no power or jurisdiction conferred upon the courts of equity, "to review or control the determination" of either the assessors or commissioners; but the power to review and cor rect errors, mistakes and abuses in the exercise of the powers of subordinate public jurisdiction, and in the official acts of public officers, belongs exclusively to the courts of law; and in this case, by express direction to the Court of Appeals, upon appeal from the judgment of the commissioners. In a case in principle identical with this, Ch. Kent declared that, "in the whole history of the English Court of Chancery, there is no instance of the assertion of such a jurisdiction as is now contended for." *Mooers vs. Smedley,* 6 *Johns. Ch. Rep.,* 28. And in the case of *The Mayor of Brooklyn vs. Meserole,* 26 *Wend.,* 138, 139, 140, it was said by the court that, "the question whether these subordinate tribunals have acted in pursuance of the powers conferred upon them by law, and whether their acts are *void* or *valid,* involves an examination *of purely legal principles, unmixed with equity."* It is admitted that the assessment of the property was made by the assessors, and that the subject matter has been, and is still, before the county commissioners; that although due notice was given to all concerned, to come forward and urge their objections to the assessments, the appellee never appeared, but recognized and acquiesced in the assessment by paying the first tax bill that was presented; that an application was made to the county commissioners to relieve the appellee from the tax, but that application was refused, and the party neglected and failed to take an appeal as directed by the statute. I contend that the appellee is concluded by the judgment of the commissioners, and that the only mode by which a review of their judgment could be had, was by an appeal direct from their judgment. The case of the *Methodist Church vs. City of Balt.,* 6 *Gill,* 391, is directly in point, and conclusive of

this case.   There the law having given to parties considering themselves aggrieved by the proceedings of the street commissioners, an appeal to the city court, as here to the Court of Appeals, the former Court of Appeals decided, that the party complaining could seek redress *only* in the city court, as directed by the statute.   And, in delivering the opinion of the court, Judge Dorsey said :   "To the court of chancery or county court, sitting as a court of equity, no such power is delegated, nor can it be lawfully or judiciously exercised by those tribunals. . To persons aggrieved by the proceedings of the commissioners in cases like the present, the Legislative enactments upon the subject have provided the tribunal and means of redress, and through these only can it be successfully sought."   6 *Gill,* 402.

The technical objection to the assessment, upon the ground of informality, and the misnomer of the appellee, is wholly untenable and unavailing here.   There is no allegation of surprise, and the party, in fact, had notice, and acted on it. All parties owning property in the State, are bound to take notice of the existence of the laws affecting their property, and to know by what means taxes are assessed and collected. The levy of the taxes constitutes a lien upon the property; and the proceedings are altogether *in rem.*   *Thompson vs. Carroll,* 22 *How.,* 432 423.   The law authorises the assessment to parties unknown, and so, too, to the heirs of deceased parties, without naming them.   The object of the true name of the owner is more to enable collectors and officials to collect than to give the parties notice; and the true name is in no case material, except where proceedings are taken to sell for taxes. The designation of the owner, however, was sufficiently certain in this assessment, and the commissioners had ample power under the 27th sec. of the Act of 1852, to make any correction or supply any omission, necessary to completeness.   But whatever mere technical defect may have existed in the assessment, the Act of 1852, ch. 337, sec. 35, has prohibited any advantage being taken of it.   It provided that, on appeal, 'neither party shall be permitted to discuss any point involv-

ing merely a question of value or *of regularity*, or any other question of fact merely." If the party is thus prohibited on a direct appeal from the action of the commissioners, how is it possible that it should be done indirectly, and through the agency of a court of equity—a tribunal that is proverbially opposed to relieving parties upon mere informal or technical grounds?

TUCK, J., delivered the opinion of this court:

The admissions of fact, to be found in the agreement, on which this case was tried, render it unnecessary to examine the points that were so fully argued at the bar, touching the inter-state rights of Maryland and Virginia. It is admitted that the property on which this tax was assessed, lies within the limits of Washington county, in this State; this brings it under the operation of the 17th section of the Act of 1852, ch. 337, which provides, that where the office of a turnpike, railroad, canal, or other improvement corporation, is not within the State, "the assessable property of such corporation shall be valued and assessed in the county in which it is situated." We agree, in opinion, with the judge below, that this bridge-property was a proper subject of taxation under that Act. It is plain, upon the words of the Act, and need not be amplified. *Howell's case*, 3 *Gill*, 14. 4 *Peters*, 563.

The questions, relating to the manner of making the assessment, and the proceedings of the commissioners of Washington county, are more difficult of solution; but upon the best consideration we have been able to bestow upon them, we have reached the conclusion, that the views of the learned judge cannot be sustained.

Taxes are laid for the support of government, and all property made liable for contribution to this object by the Constitution and laws, ought to be embraced in assessments for that purpose. It is not only the duty of the Legislature to reach all descriptions of property, for the sake of justice to all the citizens, but the interests of the State require it. To this end the

tax laws have made provision for the correction of errors on the part of the assessors, by appeal to designated tribunals; so that if they perform their duty, excessive valuations are not likely to occur; nor will any persons escape, whose property is liable to be taxed. But assessments ought not to be vacated, and the particular property released altogether, because the public officers have not strictly followed the provisions of law, which are merely directory. It is not said any where that the assessment shall be invalid if such directions are not complied with. For example, suppose the commissioners neglect to have lists prepared and deposited in the clerk's office, or the clerk were to omit his duty in that behalf, as required by the 25th section of the Act of 1852, ch. 337, would the whole assessment be inoperative, and all the property of such county discharged from its contribution to the public expenses? In the case of *Young vs. The State*, 7 *G. & J.*, 253, where a sheriff's bond had not been executed according to law, it was held that the parties were liable; that the formalities were required for the public security, and not for the benefit of the obligors. It was also said, "substance, and not form, is to control the construction of legislative enactments, prescribing a mode in which acts are to be done." Where provision is made for the relief of property owners against the improper exercise of the taxing power, the law expects those concerned to be diligent in protecting their interests; and if they omit the opportunity, they cannot be relieved in equity, if at all, unless a strong case is presented, showing, among other things, that they have not been altogether in default in availing of the means provided by the tax laws. And there must be something more than legal error assigned: it must present facts appealing to the conscience of the court, to prevent wrong and injustice. 6 *Gill*, 391. 6 *G. & J.*, 312.

It is not averred here that the assessment was excessive, or that it was made without notice to the owners, and that they had no knowledge, until after the time for appealing to the commissioners had expired, even conceding that these aver-

ments would have entitled the company to relief. The ground of the equity is, that the property is not taxable at all, and that the assessment had not been made and returned according to the law. If the objection as to the manner of making and returning the assessment, is merely technical, and goes to matters of form, and not to substance, this court ought not to interfere. It is not pretended that the bridge-property of the company was not assessed. The case shows that, if they pay this tax, they will pay on their own property and on none other. The answer shows that they had knowledge of the assessment: and no reason is assigned for their not going before the commissioners to have the supposed errors corrected. The entries in the books sufficiently identify the property. The complaint is, that their property is entered in the name of the "Potomac Bridge Company," which is not their corporate title, and the proceeding was commenced, not to correct the error by having the proper name inserted on the books, and thereby charge the real owner, but to avoid payment altogether. We have no power to make the correction, for the benefit of the public, which the commissioners might have done, and if courts of equity were to interfere in such cases, parties taxed, instead of going before the proper tribunal to have errors corrected, and thereby, whilst protecting themselves, secure to the State or county their just demands against the property, would wait until the time had elapsed, and then, by proceeding in equity, escape altogether. 6 *Gill*, 391.

Much stress was laid on the 25th section of the Act, as showing that some important privilege was designed to be conferred on property owners, and that this property had not been properly set out in the lists placed in the clerk's office. It will be observed that the lists are required to be made out in March, after the assessments are corrected in January, in which month the commissioners are required to meet. Hence, it is clear that, the supposed error in this list did not injure the company, nor so mislead their officers as to the property and the owner, thereby preventing their application to the board of

commissioners in proper time.   All persons must take notice of the law.   The Act of Assembly requires public notice to be given of the meetings of the commissioners.   The Act and the publication impute notice to all persons, whether they have actual information or not.   The 26th section of the Act authorized the commissioners to increase or abate valuation, and to exclude property which had been improperly valued.   It is well settled that, where such remedy is afforded, a court of equity has no jurisdiction to make corrections.   *Methodist Protestant Church vs. Mayor & C. C. of Balt.*, 6 *Gill*, 391.

For these reasons the decree must be reversed and the bill dismissed.

*Decree reversed and bill dismissed.*

(Decided November 2nd, 1861.)