HALLENBECK *v.* HAHN.

| 2 | 377 |
|---|---|
| 7 | 495 |
| 8 | 836 |
| 10 | 279 |
| 18 | 143 |
| 18 | 288 |
| 21 | 194 |
| 2 | 377 |
| 41 | 600 |
| 2 | 377 |
| 51 | 316 |
| 54 | 101 |

## Hallenbeck v. Hahn.

CONSTITUTIONAL LAW: *Construction.* The constitution of this State confers plenary legislative power upon the General Assembly; and, if an act is within the legitimate exercise of that power, it is valid, unless some express restriction or limitation can be found in the constitution itself.

——: ——. The provisions of the constitution, that "the State shall never contract any debt for works of internal improvement, or be a party in carrying on such works," and that the debts of the State "shall never in the aggregate exceed fifty thousand dollars," refer to the State alone, and not to the municipal corporations.

——. Municipal aid to railroads. The act of the legislature of Feb. 15, 1869, authorizing any county or city of this State to issue bonds to aid the construction of railroads, does not conflict with the provision of the Bill of Rights, that "the property of no person shall be taken for public use without just compensation therefor."

*Argument* 1. The provision relates to the taking of private property by the exercise of the power of eminent domain, and not by the exercise of the taxing power; between which powers there is a wide difference.

2. A railroad company is a public body; or, if a private corporation, it is an agent of the public to perform a public function.

3. When the constitution of this State was adopted, many other States had constitutions containing similar provisions, which the courts thereof had held not to inhibit such legislation.

INJUNCTION: *The collection of taxes.* Equity will not enjoin the collection of taxes on account of irregularities in the proceedings of the taxing officers, unless they are void, or levied upon property which is exempt; nor if a part of the tax be just, and a part be not just, will it interfere, unless tender of the part due be made.

——: *Realty.* A sale of realty for taxes will not be restrained because the owner has personalty out of which it might have been collected.

Hallenbeck *v.* Hahn.

Petition in error to the Douglas District Court.

This was a petition filed by the owner of personal and real estate to restrain the sale of the realty for taxes levied thereon; which sale the defendant, as the county treasurer, had advertised, without attempt to distrain upon the plaintiff's personalty. One and the chief ground alleged for complaint was, that a large portion of the taxes was to be applied to pay the interest upon a large amount of bonds issued by the county to the Omaha and North-western and the Omaha and South-western Railroad Companies to aid them in building their several railroads. Another ground of complaint was, that there were sixteen different irregularities, which were enumerated and set forth at length, which, as was claimed, invalidated the taxes.

The defendant filed a general demurrer, which the District Court sustained; when, upon judgment of dismissing, the petition was entered, and the plaintiff brought this petition in error.

*G. W. Ambrose,* for plaintiff in error.

I. The sale will cast a cloud upon the title of the plaintiff. A void decree was declared to be a cloud, and set aside. *Morris* v. *Hagle,* 37 *Ill.,* 150. A sale under a judgment lien, which was no lien, was declared to be a cloud, and sale enjoined. *England* v. *Lewis,* 25 *Cal.,* 357; *Pettit* v. *Sheppard,* 5 *Paige,* chap. 501. An irregular tax deed is a cloud. *Lyon* v. *Hunt,* 11 *Ala.,* 295. So an attempted sale on an invalid execution restrained. *Burt* v. *Cassity,* 12 *Ala.,* 734. Invalid street improvements declared to be a cloud. *Oakley* v. *Trustees, &c.,* 6 *Paige,* chap. 264.

That taxes are a perpetual lien upon real property no

one will doubt: they are so made by statute. Sect. 5, p. 82, *S. L. of* 1871.

We have not a complete remedy at law against this injury. *Pixby* v. *Higgins*, 15 *Cal.*, 127 ; 21 *Conn.*, 488 ; 19 *N. H.*, 91 ; 3 *P. Wms.*, 296 ; 1 *Hamp.*, 692 ; 13 *Peters*, 203 ; 18 *N. Y.*, 515 ; *Wood* v. *Chamberlain*, 2 *Black*, 430.

If this illegal tax is enforced, our property will be taken without due process of law (11 *Mich.*, 129 ; 12 *N. Y.*, 209) ; for the law has not been followed, and the proceedings are a mere arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice. *Cooley on Consti. Lim.*, 517 to 520.

II. The remedy at law is not adequate. The remedy must be adequate ; that is, full and complete. 1 *Story Eq. Juris.*, sect. 33 ; *Dr. Leiber's Ency. Americana*, art. " Equity."

If the remedy at law be a partial one, then it cannot be said to be adequate : it fails to restore to the party that which, by an unwarranted, unauthorized, and unconstitutional proceeding, and without due process of law, has been taken from him.

What is to be done with the funds arising from this illegal sale ?

Part goes to the county, part to the general school-fund, and part is paid directly over to the treasurer of the State. What becomes, then, of the part of this illegal public plunder which is taken from the citizen without *due process of law*, and which goes into the coffers of the State ? Can it be reached ? If so, how ? The State cannot be sued. The law compels the defendant to pay the money collected for taxes into the county and State treasuries.

Then sue the officer. Ah ! but his warrant is his protection (sect. 37, *Laws of* 1869) : he is bound to obey

the commands of his warrant. And even if he be not, and the sale is made or not made according to his supreme pleasure, when and under what circumstances did he ever *promise* to repay? and can there be a recovery without it?

It will be seen at a glance that in no event can the part paid into the State funds ever be reached. The county of Douglas never had the money: the treasurer obeyed the law, and paid it to the proper custodian. Sect. 75, *Laws of* 1869; 12 *Wallace*, 1; 10 *Wallace*, 676; 3 *Howard*, 250; 3 *Black*, 478; *First Nat. Bank* v. *Douglas County*, *by Judge Miller*; *U. P. R. R.* v. *Lincoln County*, *by Judge Dillon.*

III. This Court is competent to inquire into the validity or invalidity of railroad or other bonds. 10 *Wallace*, 676.

IV. The rule, that he who seeks equity must do equity, does not require the payment or tender of so much of the taxes as were legal before the enforcement of those which were illegal will be restrained; for our statute prohibits the officer from receiving payment of a part of the taxes. *Session Laws of* 1869, p. 212, sect. 93.

*J. C. Cowin*, for the defendant in error, elaborately argued the questions raised upon the proceedings of the taxing officers, and the jurisdiction of equity to restrain by injunction the tax-sale of the plaintiff's realty. His brief does not appear among the files of the Court.

*J. M. Woolworth*, intervening in behalf of parties holding bonds issued by counties to railroad companies to aid them in constructing their works, argued the single question of the constitutional validity of such instruments upon the following brief: —

I. All of the general rules of constitutional construc-

HALLENBECK *v.* HAHN.

tion which are applicable to the subject support the validity of the statute by virtue of which these securities were made.

1. It is utterly inadmissible for the Court to import into the constitution a limitation upon the legislative power, drawn from abstract reasoning, relative to the proper functions of government.

(1.) This appears from the fact, that, by such process, the proper functions of government, as well free as arbitrary government, are not ascertainable, but are disclosed only by an historical examination of the objects to which they have been in fact applied. 3 *Burke's Works*, 227 (Little & B.'s ed.); 3 *id.*, 310; *id.*, 192; 3 *Webster's Works*, 13, 305.

(2.) The same appears from the disagreements which prevail as to the just occasion for the exercise of such powers, several instances of which were mentioned.

(3.) The same appears from the fact, that the same reason is not assigned to support the exercise of particular powers by different writers, of which several instances were cited.

(4.) And in a multitude of cases it has been held, that the powers of government, and of its several departments, are to be ascertained from the constitution, and not from a consideration of elements supposed to inhere in the nature of the subject. *The People* v. *Draper*, 15 *N.Y.*, 532, 543; *Commonwealth* v. *Hartman*, 5 *Harris*, 119; *Lexington* v. *McQuillan's Heirs*, 9 *Dana*, 514; *Sears* v. *Cottrill*, 5 *Mich.*, 251; *Twitchell* v. *Blodgett*, 13 *id.*, 127; *Commonwealth* v. *McClusky*, 2 *Rawle*, 374.

2. The Court is not justified in annulling a legislative act, unless satisfied beyond a reasonable doubt that its repugnancy to the constitution is irreconcilable upon any just construction of the two instruments. *The Cincinnati, &c., Railroad* v. *Commissioners*, 1 *Ohio St.*, 77, 82;

Hallenbeck *v.* Hahn.

*Wellington* v. *The Petitioners, &c.*, 16 *Pick.*, 95; *Louis-ville* v. *Hyatt*, 2 *Mon.*, 178; *Sears* v. *Cottrill*, cited above; *Twitchell* v. *Blodgett*, cited above.

Such repugnance cannot exist to the extent called for by the rule in the case of this statute, which, in at least one hundred cases, decided upon great consideration and by three hundred different judges, have been held constitutional. A list of these cases was presented.

3. The power of taxation is, by the constitution, vested in the General Assembly, with plenary discretion in its exercise. What is sometimes. called a limitation upon the power — namely, that, under the sanction of the name, the property of one person shall not be taken and conferred on another — is more rightly a perversion of the power. *Cincinnati, &c., Railroad* v. *Commission-ers*, cited above; *Sharpless* v. *Philadelphia*, cited above; *Spier* v. *Blairsville*, 50 *Pa. St.*, 161; *In the Matter of the Trustees*, 31 *N. Y.*, 582; *The People* v. *Brooklyn*, 4 *N. Y.*, 419; *Providence Bank* v. *Billings*, 4 *Pet.*, 563; *McCol-lough* v. *Maryland*, cited above; *Weston* v. *Charleston*, 2 *Pet.*, 466; *Cheney* v. *Hoover*, 9 *B. Mon.*, 345; *Litch-field* v. *McOmber*, 43 *Barb.*, 288; *Bradshaw* v. *Omaha*, 1 *Neb.*, 16.

(1.) The twentieth section of the Bill of Rights, re-serving to the people the powers not expressly granted, does not modify the rule, for the grant of legislative power is plenary; nor does that limiting the power of the State to contract debts apply. These clauses, taken from the Ohio Constitution, were construed in *The People* v. *Flagg*, 46 *N. Y.*, 401; *Cass* v. *Dillon*, 2 *Ohio St.*, 607; *Baker* v. *Cincinnati*, 11 *id.*, 534.

(2.) And compensation within the meaning of the thirteenth section is secured. *Thomas* v. *Leland*, 24 *Wend.*, 65, 68; *Mirrick* v. *Amherst*, 12 *Allen*, 500; *Bank of Rome* v. *Rome*, cited above.

HALLENBECK v. HAHN.

(3.) The objection, that the tax is levied for a private purpose, rests on the ground, either that the object is private, or the means for attaining the object is private: on which we submit the following points : —

II. The duty of providing its citizens with roads, furnished with the most approved means of communication and locomotion, always has been regarded as, and is in fact, one of the most obvious and imperative duties devolving upon governments ; and may be discharged by its own officers and agents appointed for the purpose, or by the employment of private parties. *Rogers* v. *Burlington*, 3 *Wallace*, 663 ; *Beekman* v. *Saratoga, &c., Co.*, 3 *Paige*, 74.

1. That this has been so regarded, witness the great roads of ancient times ; the railroads of Europe, built and operated by government; the Erie Canal, still a public work in New York ; the early railroad system of Michigan ; and our own system of highways, managed by public officers, and supported by taxation.

2. This public duty may be devolved upon a private person as well as be discharged by the government directly. Such duties have been devolved on private parties, as mail-carriers, banks, toll-bridge companies, &c., and they have been clothed with quasi-public character. *McCollough* v. *Maryland*, 4 *Whea.*, 416, 417 ; *Osborn* v. *United-States Bank*, 7 *id.*, 738, 860, 862 ; *Boston Water-Power Co.* v. *Boston R.*, 23 *Pick.*, 360, 396 ; *Cottrill* v. *Myrick*, 3 *Fairf.*, 222, 233 ; *Union Pacific Railroad Co.* v. *Lincoln Co., Dillon*, 314, 323.

3. The fallacy of the argument on the other side consists in confounding the means and the end in respect of the power. If the ultimate object is legitimate, the legislature must be left free to select the means by which the same may be accomplished, provided only they be not inappropriate thereto. *McCollough* v. *Mary-*

HALLENBECK *v.* HAHN.

*land,* as cited above, 421 ; *Osborn* v. *United-States Bank,* 9 *Whea.,* 738, 859 ; *In the Matter of Townsend,* 39 *N. Y.,* 171, 174 ; *Miner's Ditch Co.* v. *Zelerbach,* 37 *Cala.,* 543, 577.

III. But a railroad company, incorporated under the general law of this State, is, in the aspect here under consideration, a public agent, and not a private corporation.

1. A railroad company, viewed with reference to the interests of its stockholders, is a private corporation ; but, viewed with reference to its duties to the public, it is a public agent : and it is in reference to this latter aspect that it is here presented for our consideration. *In the Matter of Townsend,* 39 *N. Y.,* 171, 183 ; *Swan* v. *Williams,* 2 *Mich.,* 427.

2. Its character is not to be determined by the test of any abstract definition, but by a consideration of the manner in which it has been treated.

3. The railroad has been treated as a public agent in several ways.

(1.) By the State retaining the control over it, which is one approved test of its public character. *West-River Bridge Co.* v. *Dix,* 546, cited above, *R. S.* 213, *et pass.*

(2.) By the conferring upon it the prerogative franchise of eminent domain. 25 *Vt.,* 442 ; *Boston, &c., Co.* v. *Railroad,* 23 *Pick.,* 360 ; *Bloodgood* v. *Mohawk Co.,* 18 *Wend.,* 9 ; *Beekman* v. *Saratoga, &c., Co.,* cited above.

(3.) By the exercise in its behalf of the taxing power. See cases cited under First Point, 2.

(4.) By the grant of the prerogative franchise of exacting tolls upon what has been repeatedly held to be a highway. *Williams* v. *New-York Central,* 18 *Bark.,* 222, 246 ; *State* v. *Rives,* 5 *Ind.,* 297 ; *Northern Railway* v. *Concord Railway,* 7 *Fost.,* 183 ; *Bloodgood* v. *Mohawk*

HALLENBECK *v.* HAHN.

*Co.*, cited above; *Bonaparte* v. *Camden Co.*, 1 *Bald.*, 205; *Bradley* v. *New - York Co.*, 21 *Conn.*, 294.

(5.) By the grant of vast bodies of the public land and vast amounts of the public funds to the Union Pacific Railroad Co., which is, equally with other such companies, formed for private profit. *Union Pacific Railroad* v. *Lincoln Co., Dillon's C. C.*, 314; *Thompson* v. *Union Pacific Co.*, 9 *Wall.*, 579.

IV. If the principles above laid down are sound, no just distinction exists between a subscription to stock and a donation in aid of the work. *Chicago Railroad* v. *Smith*, decided in the Supreme Court of Illinois, not reported; *Stewart* v. *Supervisors*, 30 *Iowa*, 9; *Augusta Bank* v. *Augusta*, 49 *Me.*, 507; see also *Pettiman* v. *Taswell Co.*, 19 *Ill.*, 406; *Robertson* v. *Rockford*, 21 *id.*, 451; *Rogers* v. *Burlington*, cited above; *Blanding* v. *Burr*, 13 *Cal.*, 343; *Guilford* v. *Supervisors*, 13 *N. Y.*, 149.

*E. Estabrook*, for plaintiff in error, in reply.

I. The sale threatened by the treasurer is illegal.

1. The tax in question was levied in part to pay principal and interest upon bonds amounting to three hundred and fifty thousand dollars, issued as a donation, Jan. 5, 1870, to the Omaha and South-western and Omaha and North-western Railroad Companies.

Money thus demanded is not a tax.

Taxes are defined to be burdens or charges imposed by the legislative power of a State upon persons or property to raise money for public purposes. *Blackwell on Tax Titles*, 1 *id.*, 27–30; *Johnson*, 92; *id.*, 77; *Bleeker* v. *Ballou*, 3 *Wendall*, 263; 2 *Beauvier's L. Doc.*, 578; *The People*, ex rel., *The Detroit and Howell R. R. Co.*, v. *The Township Board of Salem, Michigan, Reports* 1, *Am. Law Reg.*, August, 1870, p. 487; *Whiting* v. *Sheboygan*

25

*Railway Company, Wis. Sup. Ct. Reports, Am. L. Reg.,
March,* 1870, p. 156; *Garrard-County Court* v. *Kentucky-
River Navigation Company, Am. L. Reg., March,* 1871,
p. 151 ; and *Redfield's Note.*

It ceases to be taxation, and becomes plunder. *Sharp-
less* v. *Mayor,* 21 *Penn. St.,* 168 ; *Grim* v. *Weisenberg
School District,* 57 *Penn. St.,* 433 ; *Bradhead* v. *Milwau-
kie,* 9 *Wis.,* 652. A tax for a private purpose is a sale
as in *Language's Wapello Co. Case,* 13 *Iowa,* 405 ; 21
*Ency. Brit.,* 37 ; *Webster's Dic. ; New Am. Encyc.,* vol. xv.
p. 807 ; *Proy* v. *North. Lib.,* 31 *Pa. St.,* 69 ; *Cooley on
Court Limitations,* 479–487. The name means *tribute,*
and belonged to the king's treasury. 4 *Inst.,* 216–233 ;
*Northern Lib.* v. *St. John's Church,* 13 *Pa.,* 104–107;
*Camden* v. *Allen,* 2 *Dutch,* 398. A similar law was
vetoed in California because it was unconstitutional ;
and the people of Illinois voted the right to issue bonds
out of their constitution. See also, on this point, 11
*Peters,* 433 ; 51 *Barbour,* 316 ; 38 *Pa.,* 81; 51 *id.,* 9 ;
*Walker* v. *Cincinnati,* 21 *Ohio St.,* 14.

2. A railroad company is not a public body for whose
use money, under the guise of taxes, can be extorted
from the citizen ; for it is composed of private individ-
uals, whose rights are not enlarged by their association
together, nor filing articles of incorporation. No such
talismanic effect can flow from such trivial formalities
as to change private citizens into a public body. Nor
can any argument be drawn from the fact that the power
of eminent domain is intrusted to this association of
private individuals. They hold that power as a fran-
chise, which Webster defines to be " a particular privi-
lege conferred by grant from a sovereign or government,
and vested in individuals ;" and which Blackstone defines
as " a part of the king's prerogative in the hands of the
subject." From these definitions, it appears that the

Hallenbeck *v.* Hahn.

conferring upon a person does not make him any the less a private person, nor any the more a public body. Hotel-keepers, hackmen, owners of grist-mills on watercourses, peddlers, and all that class of persons who are licensed by public authority, exercise certain rights withheld from private persons. The pack-peddler is distinguished from a private person by compliance with the license law, and he serves a public necessity. The railroad company does no more. A single individual owning all the land between two points, and building a railroad from one to the other, would not be the proper recipient of county bonds to aid this, his private enterprise. Nor does the fact that several are associated together for the purpose, and file articles of association, enlarge their rights.

3. A distinction should be made between this case, where the bonds were a donation to the company, and cases where bonds were issued for stock subscribed. In the latter case, title is acquired to a marketable commodity, which may be again sold, and the county reimbursed, or the profits of the investment will be paid into the county treasury. *Rogers* v. *Burlington,* 3 *Wallace,* 663 ; *Whiting* v. *Sheboygan R. R. Co.,* Wis. Reg., *Am. L. Reg., March,* 1870, p. 171, and note by Dillon ; *Walker* v. *Cincinnati, Am. L. Reg.,* April, 1872, 354 ; 51 *Barbour,* 312 ; 36 *Alabama,* 410 ; 29 *Ind.*

4. The principle of uniformity lies at the foundation of all correct systems of taxation. *City of Chicago* v. *Larned,* 34 *Ill.,* 203 ; *Blackwell on Tax Titles,* 4–7 ; *Kent's Commentaries,* 331.

This principle is here violated. While one county may give much, another county equally benefited may give little, or none at all. In this case, to illustrate, the county of Douglas gives to the Omaha and South-western Railroad Company a hundred and fifty thousand

HALLENBECK *v.* HAHN.

---

dollars, having less than five miles within its limits; while Sarpy County, in which fifteen miles of the same road are constructed, opening up valuable stone-quarries, gives nothing. The benefit of the proposed road is confined to the localities through which the line may pass; while it may be a positive injury to remote portions of the county, whose inhabitants are nevertheless compelled to contribute equally of their substance.

5. The right to issue bonds of a county to aid a railroad company, and to levy taxes for their payment, must be strictly in pursuance of the directions of the statute conferring such right. *Talcott* v. *Pine Grove, in U. S. Circuit Court for Michigan*, before Emmons, Withey, and Longyear, J.J., 10 *Wallace*, 676; 3 *Comst.*, 401; *Blackwell*, 42–51; 53–57, 61–67, 78, 79; 124, 125; 215, 219, 251, 259, 260–267, 293, 294, 315, 515, 628; 1 *Devereau & Battle, Eq.*, 218; *Dwarris*, 743–749; 10 *Wend.*, 186–188; 9 *Pick.*, 414; 8 *Geo.*, 30; *Dudley*, 132; 47 *Mo.*, 484; *Tyler on Eject.*, 235–538; 3 *Washburn on R. P.*, 202–210; 6 *Wallace*, 268, 269; *Howard*, 260; 4 *Hill*, 76, 92.

(1.) This principle was violated because the levy should have been made specifically for each road. *Blackwell*, 40, 163; *State* v. *Falkinburgh*, 3 *Green*, 320; *Camden and Amboy R. R.* v. *Hillyear*, 3 *Harrison*, 11; *Laws of* 1869, p. 92, sect. 1.

(2.) The records of the clerk's office do not show that a copy of the question submitted was posted up at the place of voting during the day of election, and the other acts required by the statute. *R. S.*, 40, sect. 21; *Session Laws of* 1869, p. 100, sects. 17 and 18. These must appear upon the face of the record. *Blackwell*, 39, 40, 71, 72, 77–79, 100, 101, 205, 206, 213, 214, 245, 247, 249, 265, 311–313, 319; *Am. L. R.*, *September*, 1870, 582; *Beatty* v. *Mason*, 30 *Md.*; *Hamilton* v. *Valiant*, 30 *Mich.* " It matters not that it may be difficult to com-

Hallenbeck v. Hahn.

ply with such a rule." *Tyler's Law of Ejectment*, 536; also 3 *Washburn on Real Property*, 203–210.

" Independent of statute, the very nature of the proceeding implies the necessity of perpetuating the evidence in writing, and forbids a resort to the memory of man for proof of any material fact connected with it." *Id.*, 513; *Rix* v. *Croke*, 1 *Cowper*, 26; *Gilbert* v. *Columbia Turnpike Co.*, 3; *Johnson's Cases*, 107; *Games* v. *Stiles*, 14 *Peters*, 322; *Blackwell*, 514–516, 533; *Worthing* v. *Webster*, 45 *Maine*, 270.

(3.) The place appointed to hold the election in Omaha Precinct No. 3 was the "Mount House," corner of Davenport and Ninth Streets. There was no such house at the place designated. No election was held at that place, nor at any other place on Ninth Street; yet it appears that three hundred and sixteen votes for such bonds, and three against, were counted.

(4.) The levy made is in excess of the annual sum to be paid on said bonds. *Blackwell*, 158–162, and authorities there cited; *Session Laws*, 1870, p. 15.

II. There were radical errors in the proceedings of the taxing officers.

1. The assessor did not take the oath required by the law to support the constitution of the State. Art. II., sect. 25, *Const. of Neb.;* 9 *N. H.*, 491; 1 *Foster*, 40, 400; 6 *id.*, 182; 13 *S. & R.*, 208; 30 *Me.*, 319, *Blackwell*, 256, 257.

2. The assessment blank was defective.

3. No record remains in the clerk's office that the precinct assessors met at the time and place required to equalize their assessments. *Blackwell*, 110–113.

4. Nor did the county commissioners 'meet for the purpose of correcting the assessment roll. *Blackwell*, 110–113; *S. L.*, 1869, p. 190, sect. 27.

5. The tax-list for said year 1870, made out and kept

by the county clerk as the property of the county, has upon it no official seal. *Blackwell*, 114; *S. L.*, 1869, p. 195, sect. 37.

6. The said plaintiff had at the time said tax was due, and from thence hitherto, and still has, an abundance of personal property in the county of Douglas, out of which said taxes could have been made. *Blackwell*, 138, 176–178, 221, 225, 251, 489; *S. L.*, 1871, p. 81; *Tyler on Ejectment*, 537.

7. The notice of sale of said land is irregular and insufficient, and not conformable to the law in this, among other things: to wit, it fixes commencement of sale at ten o'clock A.M., while the law provides that it shall commence at nine o'clock A.M.; it gives no time for the close of the sale, while the law provides that it shall continue until four o'clock, P.M. *Blackwell*, 213, 215, 223, 225, 233, 262, 347; *S. L.*, 1869, p. 201, sect. 55.

8. The description of the land advertised to be sold is imperfect and insufficient in this, among other things; to wit, the township and range are not sufficiently indicated. *Blackwell*, 123–137, 147, 148, 206, and *Re.*, 226, 356.

9. There is no evidence as to the time when the assessment list of the precinct wherein said land lies was returned, or deposited or filed with the county clerk. *Blackwell*, 118–123; *id.*, 170, 255; *S. L.*, 1869, p. 186, sect. 24.

10. The description of said land in said list and duplicate in the office of the county clerk and county treasurer is vague, uncertain, and insufficient. *Blackwell*, 123–137, 147, 148, 206 and *note*, 226, 356; *S. L.*, 1869, p. 188, sect. 24, sub. 2.

11. The amount of valuation and tax in said lists is vague, uncertain, and insufficient; there being no entry,

HALLENBECK *v.* HAHN.

mark, or character, to indicate the signification of the figures found in the column of amounts, as shown by diagram above. *Blackwell*, 202; *Lawrence* v. *Fast*, 20 *Ill.*, 338, 340, affirmed in 1 *Wallace*, 398; *Lane* v. *Bommelman*, 21 *Ill.*, 147.

12. The grounds and buildings of a large number of religious societies in the county of Douglas aforesaid, such societies being corporations duly organized under and by virtue of the laws of Nebraska, and amounting in value to at least fifty thousand dollars, were excluded from the assessment list of 1870, and were regarded and treated by all the assessors of said county as exempt from taxation. *Blackwell*, 4, 6, 20, 30, 408–410; 2 *Kent*, 321; *Law Register*, August, 1871, p. 493, and *note* by Redfield; *id.*, 504; *Tyler on Ejectment*, 535; *Weston* v. *The City of Charleston*, 2 *Pet.*, *S. C.*, 449; *Brewster* v. *Hough*, 10 *N. H.*, 138.

13. The names of owners are omitted in the list of lands published as delinquent. *Blackwell*, 144.

III. Injunction is an appropriate remedy. *Blackwell*, 481–799; 4 *Kernan*, 9; 6 *Minnesota*, 106; 9 *Wis.*, 402; *id.*, 410; *Wis.*, 272; *Nash's Pleading and Proctor*, 440, and authorities there cited; *Lockwood* v. *City of St. Louis*, 24 *Mo.*, 20; *Fowler* v. *City of St. Joseph*, 37 *Mo.*, 228; *Leslie* v. *The City of St. Louis*, 47 *Mo.*, 479; *Anderson et al.* v. *The City of St. Louis et al.*, 486; *Ewing* v. *The City of St. Louis*, 5 *Wall.*, 413; *Dows* v. *The City of Chicago*, 11 *Wall.*, 108; 13 *Barb.*, 567; 24 *id.*, 181; *Hilliard on Inj.*, 455; *Bradshaw* v. *Omaha*, 1 *Neb.*, 16 *Session Laws*, 1871, p. 124; *Burnet* v. *Cincinnati*, 3 *Ohio*, 61; 6 *Ohio*, 53; 5 *Wall.*, 74; 3 *Pet.*, 206, 210, 272, 282; 6 *Wall.*, 268; 5 *Wall.*, 413; 14 *N. Y.*, 534; 22 *Ga.*, 369; 4 *Iowa*, 500; 29 *Me.*, 196; 6 *John's Chancery*, 28; 26 *Wendall*, 132; 9 *Paige*, 388; 12 *Wall.*, 1.

HALLENBECK v. HAHN.

CROUNSE, J.

The chief ground relied on, and perhaps the real inducement leading the plaintiff to apply to the Court below for an injunction to restrain the defendant, as treasurer of Douglas County, from enforcing the collection of taxes assessed against the plaintiff by a sale of his real estate, is, that, to the extent of four mills on the dollar, the tax is to apply in liquidation of the three hundred and fifty thousand dollars of bonds voted by said county in aid of the construction of the Omaha and Northwestern and the Omaha and South-western Railroads. It is averred in the petition, that said levy was unauthorized, illegal, and void, because, among other reasons, said bonds were a gift or donation to said roads, the same being private corporations; and such bonds and the interest thereon cannot be made chargeable as a public tax.

This question was argued very ably and at great length; and although for good and sufficient reasons, resting in well-established principles of equitable jurisprudence, which will hereinafter be noticed, the judgment of the District Court refusing an injunction might be sustained, it is expected that this Court will express itself upon the question of the validity of the law authorizing the issue of these bonds. I have had occasion to announce my views in reference thereto when sitting in the District Court; but in view of its importance, and the magnitude of interests involved, it is well for this, the Court of last resort, to seize the first opportunity to put the matter at rest. As long as the law remains on our statute-books, and as long as it is impossible for railroads to be constructed through counties so as to confer equal benefits upon all sections alike, so long will there be rebellion against taxes levied in their support. While this continues, an uneasiness will necessarily possess the

holders of bonds already issued, and a doubt be thrown over those which may hereafter be put forth, which must result in a prejudice to the credit of the State, which can only be removed by a final adjudication by this tribunal.

The law under which these bonds were issued is entitled, " An Act to enable counties, cities, and precincts to borrow money on their bonds, or to issue bonds, to aid in the construction or completion of works of internal improvement in this State, and to legalize bonds already issued for such purpose," and was approved Feb. 15, 1869. Without reciting the several sections relating to the manner of voting, the canvass of the votes, the issue of the bonds, and the legalization of those previously issued, so much of the law as undertakes to give the authority is contained in sect. 1, which reads as follows: —

" Sect. 1. — *Be it enacted by the Legislature of the State of Nebraska,* That any county or city in the State of Nebraska is hereby authorized to issue bonds to aid in the construction of any railroad, or other work of internal improvement, to an amount to be determined by the county commissioners of such county or the city council of such city, not exceeding ten *per centum* of the assessed valuation of all taxable property in said county or city, *provided* the county commissioners or city council shall first submit the question of the issuing of such bonds to a vote of the legal voters of said county or city in the manner provided by chapter nine of the Revised Statutes of the State of Nebraska for submitting to the people of a county the question of borrowing money."

Nothing is said against the manner of passing this act. Let it further be conceded, that the action of the county commissioners has been in strict pursuance of it, and it would seem that our duty in the premises is quite simple, — to examine our constitution, and see whether this

law runs counter to any of its provisions; for, unless the constitution is violated in some of its parts, the plain office of this Court is to declare the act constitutional. With any question as to the wisdom of the law or the policy of its enactment, we, in common with all citizens of the State, may have our opinion; but we have no right to avail ourselves of our position to give effect to such opinion, unless it accords with principle and authority. The province of the Court has too frequently and too unmistakably been declared, to be misunderstood or disregarded. I will encumber this opinion with citations from only a few of the hundreds of cases which might be adduced to show, that in respect to legitimate subjects of legislation, as taxation, the legislature is supreme, except where restricted by the constitution.

" All legislative power," says Chief Justice Church in *The People* v. *Flagg*, 46 *N. Y.*, 401, " is conferred upon the Senate and Assembly; and, if an act is within the legitimate exercise of that power, it is valid, unless some restriction or limitation can be found in the constitution itself. The distinction between the United-States Constitution and our State Constitution is, that the former confers upon Congress certain specified powers only, while the latter confers upon the legislature *all* legislative power."

Chief Justice Redfield, in the case of *Thorpe* v. *Rutland and Burlington Railroad Company*, 27 *Vermont*, 142, says, " It has never been questioned, so far as I know, that the American legislatures have the same unlimited power in regard to legislation which resides in the British Parliament, except where they are restrained by written constitutions. That must be conceded, I think, to be a fundamental principle in the organization of American States. We cannot well comprehend how, upon

HALLENBECK v. HAHN.

principle, it should be otherwise. The people must, of course, possess all legislative power originally. They have committed this in the most general and unlimited manner to the several State legislatures, saving only such restrictions as are imposed by the Constitution of the United States, or of the particular State in question."

Mr. Justice Baldwin of the Supreme Court of the United States used this language in the case of *Bennett* v. *Boggs,* 1 *Bald.,* 74 : " We cannot declare a legislative act void because it conflicts with our opinions of policy, expediency, or justice. We are not the guardians of the rights of the people of the State, unless they are secured by some constitutional provision which comes within our judicial cognizance. The remedy for unwise or oppressive legislation within constitutional bounds is by appeal to the justice and patriotism of the representatives of the people. If this fail, the people, in their sovereign capacity, can correct the evil ; but the courts cannot assume their rights. There is no *paramount* and *supreme* law which defines the law of nature, or settles those great principles of legislation which are said to control State legislatures in the exercise of the powers conferred on them by the people in the constitution."

In Illinois, the Supreme Court of the State has said the true inquiry is, whether " the will of the representatives, as expressed in the law, is or is not in conflict with the will of the people as expressed in the constitution ; and, unless it is clear that the legislature has transcended its authority, the courts will not interfere." *Lane* v. *Dorman,* 3 *Scam.,* 238.

In *Morrison* v. *Springer,* 15 *Iowa,* 304, the Court say they " will declare a law unconstitutional only when it is clearly, palpably, and plainly inconsistent with the provisions of that instrument."

### Hallenbeck *v.* Hahn.

Mr. Justice Miller of the same Court, in a later case, *Stewart* v. *Sups. of Polk Co.*, says, "It seems clear by logical deduction, and upon the most abundant authority, that this Court has no authority to annul an act of the legislature, unless it is found to be in clear, palpable, and direct conflict with the written constitution."

In *ex parte Selma and Gulf Railroad Company*, 45 *Alabama*, 696, in a case like the present, Mr. Justice Peters, in delivering the opinion of the Court, says, "Unless it appears that there is some express limitation imposed on the legislature by the State constitution, which fetters the General Assembly in its power to make such a grant to the county as that exercised under the act in question in this case, it is reasonable to conclude that none such exists. The omission to make the limitation leaves the power as broad as the sovereignty itself; that is, 'absolute and irresistible.'"

Judge Manning, in *Sears* v. *Cottrell*, 5 *Mich.*, 251, says, "If it be said the law is unnecessarily severe, and may sometimes do injustice without fault in the sufferer under it, our reply is, These are considerations that may very properly be addressed to the legislature, but not to the judiciary: they go to the expediency of the law, and not to its constitutionality. When courts of justice, by reason of such objections, however well founded, seek for some hidden and abstruse meaning, in one or more clauses of the constitution, to annul a law, they encroach on the power of the legislature, and make the constitution instead of construing it. They declare what the constitution should be, not what it is. The tendency of courts at the present day is, we think, too much in that direction. Hence, to some extent, the great number of constitutional questions that are constantly being brought before the courts for adjudication. The time was, and the period is not far distant, when

courts were reluctant to declare a statute void, and did not feel warranted in doing so, unless they could lay their finger on the particular clause that was violated, and the conflict between the statute and constitution was obvious."

This doctrine is elementary, is cardinal, and arises out of the very nature of our form of government. With us, sovereignty resides with the people. Were they acting as a whole for themselves, there can be no doubt but this, or any other law that should receive a majority sanction, would be conclusive. But, parcelling out the exercise of their sovereign power to the three departments of government, — the legislative, the executive, and the judicial, — to the first has been committed, except what has been abandoned to the Congress of the United States, the exercise of the whole sovereign law-making power as completely and absolutely as possessed by the people, subject only to such limitations as the people may have chosen to impose. These limitations are set out in the State constitution. In the exercise of this power the legislature has divided the State into certain subdivisions, and created municipal corporations known as counties. Its authority so to do no one disputes. Of itself, a county has no inherent power: what it has comes from legislative grant. For the proper administration of justice, court-houses and jails must be built. To afford means of intercourse, and the transportation of persons and produce, roads and bridges must be constructed. It may be necessary to sue or be sued, contract and be contracted with. All these things the legislature has said a county may do, and no one doubts its right so to declare.

In the case before us the legislature has gone farther. In addition to ordinary highways, it has permitted counties, by donations to such persons or corporations as

shall engage in building them, to introduce improved roads — railroads — by which the people can transport themselves and their property much more quickly and at less cost than by ordinary roads. If, then, the power of the legislature is full enough to confer upon counties the several powers I before enumerated, it must be broad enough to convey this additional privilege, unless they have exercised a power not legislative, or in exercising legislative powers they have transcended some limitation found in the constitution. We may well, therefore, call upon those who challenge the validity of the law of 1869 to point out the section of that instrument which has been disregarded in its enactment; in the language of one of the cases I have cited, " to lay their finger on the particular clause that is violated."

Sect. 6 of the article on finance in the constitution says, " The State shall never contract any debt for works of internal improvement, or be a party in carrying on such works." This plainly can have no other reference than to the State considered as a sovereign corporation. It does not mean the State considered territorially certainly : that is inanimate, and could not be a party in carrying on any work. It cannot mean the State in all its parts : the State is made up of individuals and corporations both private and public. To say that individuals shall not engage in carrying on works of internal improvement, is to say that no works of that character shall be engaged in at all within the State. There is no more reason why private corporations should not engage in such works than that individuals should not. To contend that counties, precincts, and cities shall not so engage, is to forbid the construction of roads, bridges, ferries, streets, sidewalks, wharves, drains, waterworks, gas-works, — all of which are works of internal improvement.

HALLENBECK *v.* HAHN.

Neither can any objection against this legislation be found in that other section of the same article (sect. 4) which says, " For the purpose of defraying extraordinary expenditures, the State may contract public debts; but such debts shall never in the aggregate exceed fifty thousand dollars." This, like the other section, means what it says, — the State, and not counties and cities. *Expressie unius est exclusio alterius.* There is not a county in the State, nor a city of any pretensions, but has incurred indebtedness of greater or less amount, — some a great way beyond the limit here fixed. There is, perhaps, never a time that the State proper is not up to this limitation of indebtedness ; and it cannot be supposed that it was the purpose to limit the aggregate of indebtedness of all the school districts, counties, and cities, at any one time, to fifty thousand dollars! But counsel had not the presumption to urge this; and I will not pursue the discussion of that which is patent upon its face. It needs not authority: but I cite *Board of County Commissioners of the County of Leavenworth* v. *Miller,* 7 *Kansas ; Cass* v. *Dillon,* 2 *Ohio St.,* 612–616 ; *Slack* v. *R. R. Co., B. Monroe,* 1 ; *Dubuque* v. *R. R. Co.,* 4 *Greene,* 1 ; *Prettyman* v. *Sups.,* 19 *Ill.,* 406, 411 ; *City of Aurora* v. *West,* 9 *Ind.,* 77–79 ; *Clark* v. *City of Janesville,* 10 *Wis.,* 136, 170 ; *Cooley's Con. Lim.,* 216–219.

Nor is the law obnoxious to sect. 13 of the Bill of Rights, which declares, " The property of no person shall be taken for public use without just compensation therefor." No specific property is sought to be taken from the plaintiff for public use. Nothing is demanded but a tax assessed against him in common with all tax-payers of the county. The section referred to governs the exercise of the right of eminent domain by the public, as in the appropriation of one's land for highways, railroads, and like purposes. The distinction is

well expressed by Mr. Justice Butler in *Booth* v. *Town of Woodbury, Am. Law Reg., N. S.*, vol. v. p. 212, where he says, " Exacting money by taxation, and taking private property for public use, are different things. Both, it is true, are, in one sense, the exercise of a right to take the property of individuals for public use ; but there is a broad distinction between them. Taxation exacts money from individuals as their share of a justly imposed and apportioned general public burden ; and the equivalent is presumptively received in the benefits conferred by the government. Property taken for public use from one or more individuals only, by right of eminent domain, is taken, not as his or their share of an apportioned public burden, but as something distinct from and more than his or their share of the public burdens ; and therefore the justice and necessity of a constitutional provision for compensation." This same distinction is recognized by Judge Redfield in a note to the same case. See also, upon the same point, *The People* v. *Mayor of Brooklyn*, 4 *Comstock* (*N. Y.*), 424. The distinction is admitted by judges who contend for the invalidity of laws like this. See *Hanson* v. *Vernon*, 27 *Iowa*, 28.

The sections to which I have alluded are the only ones I find in the constitution of this State which afford the slightest pretext upon which to found an argument or claim that the Act of 1869 is in conflict with the organic law. But even these are not pointed out by counsel as opposed to the enactment of the law. Neither do I understand that it is claimed that any provision of that instrument has been disregarded. The duty of the Court would be, then, to declare, as has been done by the courts of some twenty-six States having constitutions no more restrictive than ours, in more than a hundred different cases, that the legislature may pass a law authorizing municipalities to vote bonds in aid of the con-

HALLENBECK *v.* HAHN.

struction of railroads, and that such laws are valid, and must be enforced by the Court.

But we are invited by counsel into a broader field, — one where the Court can exercise authority at will, untrammelled by constitutional references. The substance of the demand upon us is, that if the people will not adopt a constitution sufficiently restrictive, or, having adopted one, will not amend it so as to limit the legislature, and the legislature will persist in enacting laws like the one in question, and a majority will insist on voting aid to railroads, the Court, in its defence of an " outraged minority against the assaults of that hydra-headed monster the majority," should rise superior to all, and annul the law. This demand is made upon the authority of the new light, set up in the cases of *Whiting* v. *The Sheboygan Railway Co.* and *The People* v. *Salem,* recently delivered in the courts of Wisconsin and Michigan respectively, and which furnish the repertory, to a large extent, for the argument addressed to this Court. The doctrine is both novel and startling. In one other State, laws like this were at one time declared unconstitutional. In *Hanson* v. *Vernon,* 27 *Iowa,* 28, this conclusion is reached by the Supreme Court of Iowa. But Judge Dillon, who delivered the opinion of the Court, was not bold enough to cut loose from the constitution. He says, " As a judge, I lay claim to no right to annul an act of the legislature because I deem it unwise or impolitic, or because it does not square with my notion of natural equity and jurisprudence. . . . Justice has her imperial seat in the bosom of every man. On these, and not on specific constitutional provisions, must reliance be had in many cases of indefensible legislation; the remedy being to secure a repeal of the law, and not its judicial annulment." After this eloquent confession of subordination to the constitution, and expression of

26

Hallenbeck *v.* Hahn.

respect for the legislature, we might expect the Court to place its finger on the clause between which and the law there is that plain, palpable, and unmistakable conflict which alone should lead a court to declare void a solemn act of the legislature, bearing the approval of the executive of the State, and under which rights to the extent of millions of dollars have become involved. But I confess, that the greatest conflict I discover is between the above proclamation of the Court and its fulfilment. Instead of pointing out any section which in terms, or by any seeming intendment, inhibits the legislature from authorizing municipalities to aid in the construction of railroads or other works of internal improvement, the Court says, " I think I shall be able to convince the impartial judgment of any lawyer or intelligent man that the Act of 1868 (the law authorizing the bonds) is not a valid or legitimate exercise of the taxing power ; that, though the money demanded of the citizens is called a tax, it is not such, but is in fact a coercive contribution in favor of private railway corporations, and violative, not only of the general spirit of the constitution as to the sacredness of private property, but of that specific provision which declares ' that no man shall be deprived of his property without due process of law ' (*Bill of Rights*, sect. 9), — a provision which is adequate to protect the owner from being despoiled of his property by an unauthorized law or illegal tax."

It will occur to any one, that, if any tax is " illegal," it may be because the law under which it is levied is " unauthorized ; " and, if the law is " unauthorized," it must be because the legislature has transcended some limit in its enactment. If so, why invoke the above section of the constitution " to protect the owner from being despoiled of his property " ? The general power of the Court is sufficient without the aid of that section.

HALLENBECK *v.* HAHN.

Again : " without due process of law " and " except by the law of the land " are alike in meaning. *Cooley's Constitutional Limitations*, 1 *Am. Law Reg.*, *N. S.*, 26. But every statute is the law of the land, unless restrained by some constitutional provision. To prove that it is not a statute, that the law is void, it must be shown wherein the constitution is violated. To say that no man shall be deprived of his property without due process of law in this case, is but saying that the law is void because it is void. This section has a place in perhaps all the American constitutions, being imported into them from Magna Charta, which was extorted from King John by the barons of England. The definitions of this clause are perhaps more diverse than those of any other in the constitutions. In one case the phrase is held to mean one thing; in another case another meaning is extracted. But, when a court is resolved on pronouncing a law void, it serves a convenient purpose to refer the law to this section. Used originally to save the people, through the legislative branch, from the arbitrary conduct of the sovereign, exercised through his judges, its use is completely reversed ; and we find that the people are to be saved, under it, from the unwarranted acts of the legislature, through the judges.

The argument of the learned judge who delivered the opinion in *Hanson* v. *Vernon* is, like all his productions, quite able, and displays great ingenuity. It illustrates, however, the remark of Mr. Justice Manning in *Sears* v. *Cottrell, supra,* where he says, " When courts of justice, by reason of such objections, however well founded, seek for some hidden and abstruse meaning, in one or more clauses of the constitution, to annul a law, they encroach on the powers of the legislature, and make the constitution instead of construing it. They declare what the constitution should be, not what it is." It is

evident that the Court regarded the legislature as unwise in enacting the law, and the people as very unwise and reckless in loading themselves very heavily with burdens in aid of railways. The author of the opinion introduces a very touching picture of the " disaster, the child of extravagance and debt and dishonor, the unbidden companion of bankruptcy, as the bitter but legitimate consequences " of their action. As it forms no argument for or against the validity of the law, and although the Court disclaims being influenced by such consideration, the idea cannot be repressed, that it is possible the mind of the Court, although unconsciously, was moved by a strong desire to annul the law. If the financial condition of Iowa, as represented by her learned judge, is not accepted as an apology for the conclusions reached, it will at least be regarded as the incentive to the display of that astuteness which finds inhibition against this kind of legislation hid under a section, where, throughout more than a quarter of a century of litigation over railroad bonds, it had never been discovered. The case of *Hanson* v. *Vernon*, however, does not stand even as the law of Iowa to-day. The Supreme Court of that State has expressly overruled it in the late case of *Stewart* v. *The Supervisors of Polk County*. The opinion of the Court, delivered by Mr. Justice Miller, must remain unanswerable so long as courts confine themselves to the limits of the constitution, and as long as the purposes for which railroads are constructed are regarded as sufficiently public to warrant the exercise of that high sovereign prerogative, — eminent domain.

With more consistency, however, and with a boldness which is really sublime, the Court, in the case of *The People* v. *Salem*, 20 *Mich.*, 452, in pronouncing the invalidity of the railroad-aid law, refuses to submit to the embarrassment which must arise from trying to show a

HALLENBECK *v.* HAHN.

law unconstitutional which is not opposed to the constitution. Failing to find any constitutional limit upon the authority of the legislature to legislate upon any subject, the Court feels at liberty to consider the justness or propriety of the law, or to examine to see whether there is not, in the language of the Court, "some limitation upon the legislative power inherent in the subject itself," and approve or condemn accordingly. Mr. Justice Cooley, who delivers the opinion of the Court, in speaking of the general authority of the State to prescribe and determine the objects to be provided for, fostered, or aided, through the expenditure of the public money, says, "It is conceded, nevertheless, that there are certain limitations upon this power, not prescribed in express terms by any constitutional provision, but inherent in the subject itself, which attend the exercise under all circumstances, and which are as inflexible and absolute in their restraints as if directly imposed in the most positive form of words." This I can but regard as a most dangerous rule. It is not only opposed to the settled doctrine relating to constitutional limitation as pronounced in numberless cases, but opposed to the rule as recognized by the Supreme Court of Michigan, proclaimed by Judge Cooley himself. In the case of *Twitchell* v. *Blodgett*, 13 *Mich.*, 127, this learned judge says, "It is conceded to be the settled doctrine of this Court, that every enactment of the State legislature is presumed to be constitutional and valid ; that, before we can pronounce it otherwise, we must be able to point out the precise clause in the constitution which it violated ; and that the conflict between the two must be clear, or free from reasonable doubt; since it is only from constitutional provisions, limiting the legislative power and controlling the legislative will, that we have authority to declare void any legislative enactment." Then

the Court regarded itself possessed of authority to annul a statute only when it is in clear conflict with some express provision of the constitution : now it feels warranted in doing so upon the fancied conflict with some limitation inherent in the subject legislated upon.

But what is this "inherent limitation"? where the repository in which it may be looked for? how are we to know it when it is found? The legislature, of course, is forbidden to judge of it. The Court assumes the sole power of determining it. It may be styled judicial limitation. But this judicial limitation is likely to vary as it is applied by different courts. Even the same court differs in its opinion at different times, as is illustrated by the change of mind in the Court of Michigan as to the true province of the judiciary in considering constitutional questions. Courts are but men clothed with official power. Men differ widely about theories of government, and the proper subjects to be encouraged and aided. Scarcely any law of general operation but conflicts with some one's opinion of right. Judges, as men, must have their notions, and some very peculiar ones, as to the true sphere of government; and all certainty as to questions of constitutional law is at an end if they are allowed to destroy legislation which does not square with their views. Then where is the legislature to look to determine the validity of any law it is about to pass? If the rule announced is true, no enactment of the legislature can be said to be valid until it has undergone the test of judicial limitation. No instrument can be made, nor right acquired, under it, till it is ascertained that the courts will permit the law to stand.

If this Court were to consent to set aside the law of 1869 for other reasons than that it conflicts with the constitution, let us see upon what ground or argument it is asked. "Taxes," we are told, "are defined to be bur-

HALLENBECK *v.* HAHN.

dens or charges imposed by the legislative power of a State upon persons or property to raise money for public purposes." The definition is a good one. We are further told, that money demanded to pay bonds, donated to these railroads, " ceases to be taxation, and becomes plunder." This expression, denouncing taxes of this kind as plunder, took its origin, I believe, in a dissenting opinion in the railroad-bond case of *Sharpless* v. *Mayor*, 21 *Penn. St.* No doubt it was pronounced in something of that kind of humor which so frequently is discovered in dissenting opinions, and has served to give an air of spirit to most of the arguments delivered since on that side of the question. Counsel give it a prominent place in their brief. Judge Cooley quotes it. But I cannot believe it is put forward as argument. It has no legal signification, neither does it form any standard by which to try the validity of any law. Many of our people think it plunder to pay a tax to build a half-million-dollar penitentiary in which to confine a stage-coach full of prisoners. The resident of a city, who is taxed to pay for the improvements upon one street which draws business from and depreciates the value of his property and business on another, regards the tax as plunder. To the man with more property than children, a tax under a free-school system, to pay for the education of his neighbor's children, seems plunder ; while some are so averse to the payment of any levies in support of government as to regard all taxes as plunder. But the wisdom of man is incapable of devising any system of taxation which can work equally and do exact justice to all. The location of a railroad cannot well be made so as to accommodate all alike. In this respect it does not differ from the location of county roads or district schoolhouses. The contests concerning each are frequently bitter ; but the nine-tenths who favor the intro-

duction of the highway or the railroad, as in this case, are equally to be protected by the Court with the remaining tenth who so bitterly oppose. So, unless the Court is to be moved by passion instead of reason, the charge of "plunder" is entitled to no consideration. We pass on to notice further objections urged against this tax.

, I think I fully and fairly state the main proposition of counsel when I say, it is claimed, that, these railroad companies being private corporations, these bonds are donated to a private purpose, and that taxation can only be upheld in support of public, and not private purposes ; that a railroad serves a public need only as a hotel, a hackman, or a pack-peddler, does ; that each controls and receives the profits of its or his own business ; and that taxation can as well be maintained in support of the latter as in aid of the former.

In authorizing the tax in question, the legislature assumed that it was for a public purpose. The framers of this law were public men, understanding the nature of the duties in the discharge of which they were engaged ; and I have not the vanity to believe that my judgment of what is a public purpose is better than theirs. What is more, questions as to the true objects of government, and what is of sufficient public interest to justify taxation, are for the legislative, and not the judicial, branch of the government to determine. If the Court were ready to travel out of its legitimate sphere, and invade the province of legislative discretion in matters of governmental concern, who could point us to the line of distinction between subjects of sufficient public benefit to warrant taxation and those to which it must be denied ? It is said that a railroad serves a public need only as a hotel or pack-peddler does. But does that help us any ? The same may be said of a common highway. The com-

HALLENBECK *v.* HAHN.

mon highway is a means for the passage of passengers and freight. A railroad is the same. The highway carries no one. To make it useful involves the expense of owning or hiring teams. So does the use, by the citizens, of a railroad involve expense. But experience shows that passengers and freight can be better, more expeditiously, and more cheaply, transported by rail than over common highways. With respect to its use by the public, the railroad is as free as a common highway. The railroad company is bound by law to furnish suitable accommodations, and serve all alike: so, in fact, the railroad serves the public more fully than a common highway. So, if there is any basis for saying that the government shall not aid railroads because they are like hotels or pack-peddlers as to their benefits, it may be said that government should not support common highways. The same argument would destroy most of the objects of government.

The point more particularly which was sought to be made by counsel by so extravagant a comparison as that between a railroad and a pack-peddler is, that, if the Court will allow aid to be granted to the one, it must to the other; and that, before long, the government will be subsidizing pack-peddlers, hackmen, and like subjects. The Court should stand by any legitimate or necessary result which may flow from a position taken: and I confess, that if pack-peddling shall become of so great public importance as to require it; if " the greatest happiness of the greatest number," which is said to be the end of a good government, demands that the legislature shall permit bonds to be voted to aid pack-peddlers in their business, — I see no authority for interfering.

The fault with this kind of argument is, that it denies to the legislature the possession of any wisdom or integrity. It assumes that that body is a pack of knaves or

pirates, intent upon plundering the people; and that it is the duty of the Court to keep a sharp eye upon them. I have that confidence in the legislature to believe that it will be some time before the Court will be called upon to pass upon the validity of bonds issued in aid of pack-peddling. A principle is not to be destroyed because, in its application, it may be abused.

Another objection relied on is, that these bonds are given to a " private " corporation. What matters it if the means employed are private, if the object attained is a public purpose? Is the public benefited any the less whether the road is operated by the public or by private corporations? Many States build railroads and canals. Their power to do so, if not restrained by their respective constitutions, is admitted, even in these adverse decisions. But the history of this class of enterprises shows that it is economy to aid a private company, rather than to build and assume the management of a railroad as a State. More than this, governments are not formed to operate railroads, or to make money. If the roads are built by the public, it is for the purpose of meeting a public need, — to develop the country, improve trade and commerce, and give improved facilities to the people to transport themselves and products. If all this can be done as well, and more economically, through private than public property, I can see no objection to its being so done.

In his work on Constitutional Limitations, Judge Cooley, in treating of the public benefit of a railroad which warrants the taking of private property on which to build them, answers this same objection. He says (p. 537), " And while there are unquestionably some objections to compelling a citizen to surrender his property to a corporation, whose corporators, in receiving it, are influenced by motives of private gain and emolu-

HALLENBECK *v.* HAHN.

ments, so that *to them* the purpose of the appropriation is altogether private ; yet, considering it to be settled that these highways are a public necessity, if the legislature, reflecting the public sentiment, decide that the general benefit is better promoted by their construction through individuals or corporations, it would be pressing a constitutional maxim to an absurd extreme if it were to be held that the public necessity should only be provided for in the way which is least consistent with public interest." *Beckman* v. *Saratoga and Schenectady R. R. Co.*, 3 *Paige*, 73 ; *Wilson* v. *Blackbird-Creek Marsh Co.*, 2 *Pet.*, 251 ; *Bonaparte* v. *Camden and Amboy R. R. Co.*, 1 *Bald.*, 205.

The United-States Government employs private corporations and persons to carry the public mail. It aids the construction of railways, that the mails may be the more speedily transported ; that supplies, munitions of war, and troops, may be carried, to the end that the public may be better protected and cared for. It was never urged before that the only way this could be effected would be for the government to own and operate its own roads.

The State has no public printer, but hires its printing done. It has no public wolf or gopher killer, but encourages private persons to work a public good, and pays them in taxes gathered from the public. Even the State whence emanates this new light upon donations to railroads gives donations to salt manufacturers, although the property is private ; and the courts sustain the law. See *People* v. *State Auditor*, 9 *Mich.*, 327 ; *East Saginaw Company* v. *The City, &c.*, 19 *Mich.*, 278.

In the consideration of this question thus far, a railroad corporation has been considered as strictly private. In the view I take of the matter, it is of little importance whether it be regarded as private, public, or *quasi-*

HALLENBECK v. HAHN.

public. The end attained is the object to be kept in view. If that is public, it matters not whether the means employed be public or private. Yet is not a railroad corporation a public one? In many respects it is. It certainly is subject to public control and restraint not common to the hotel or pack-peddler. The peddler trades with whom he pleases: the railroad company must serve all alike. The farmer goes and comes when he pleases: the railroad company must run on time, or pay the penalty. The one charges what he chooses: the other may be governed by the State in respect to its rates. The peddler may change or abandon his business: the railroad company, after becoming a thoroughfare, must keep it up; and every dollar of its earnings must, if necessary, be applied to keep up its maximum efficiency as required by law. In the case of *State* v. *New-Haven Company*, *Conn.*, 538, a railroad company refused to run trains over a part of its road. It was coerced to do so by *mandamus*. Ellsworth; J., says, "What right had it to covenant it would not run its cars to tide-water, as its charter prescribes and the public accommodation requires?" In the case of *Erie County* v. *Casey*, 26 *Penn. St.*, 287, in which a charter was repealed, and the government took possession of the road, and it was urged that it was seizing private property, Mr. Justice Black says, "This act takes nothing but the road. Is that private property? It is a public highway, solemnly devoted to the public use. When the lands were taken, it was for such use, or they could not have been taken at all. Railroads established upon land taken by right of eminent domain, by authority of the Commonwealth, created by her laws as thoroughfares for commerce, *are her highways*."

But to show distinctly, and conclusively as I maintain, the public character of this class of enterprises,

HALLENBECK *v.* HAHN.

and to show how railroads are like common highways, and unlike the property they have been compared with, I refer, lastly, to the grant of the exercise of the sovereign right of eminent domain. The constitution of this, as well as of other States, provides that private property shall not be taken for public use without just compensation. This implies that it can only be taken for public use, and not for private purposes. But our statute (chap. 25, R. S.) permits the citizen's farm to be cut in two, or his house to be destroyed, if necessary, to build railroads. The same law has a place upon the statute-books of every State in the Union; and the courts of all, Michigan included, maintain the validity of the law. Why is this? Only because the railroad is a matter of public use, a public benefit. A corner lot might be coveted as an eligible spot on which to build a hotel. The owner of the lot refusing to sell, the hotel cannot be built there. There is no way to obtain it. It is private property, and the constitution will not permit it to be taken except for public use. The hotel is not for public use in the sense of the constitution. Government has never engaged in hotel-keeping, nor deemed it necessary to provide therefor. From the earliest time, however, government has assumed the duty of furnishing facilities for travel. Roads are of so great use, and so indispensable, that government has charged itself with the duty of providing them. Hotels can be dispensed with.

How is it, then, that we can regard a railroad as public till we have invaded the most sacred rights of the citizen by wresting his land from him, willing or unwilling, and immediately become blind to its public character when we undertake to use the taxing power, which has no limit under the constitution?

On this point, Mr. Justice Valentine, in as able an

opinion upon the question of the validity of bonds under a like law, delivered in the case of *Commissioners of Leavenworth County* v. *Miller*, 7 *Kansas Report*, as it has been my pleasure to read, says, " We have the combined authority of every legislature, of every executive, and of every court, in the United States, that the construction and operation of a railroad, even in the hands of a (usually called) private corporation, is a public purpose ; for, if it were otherwise, every lawyer in the land knows that the sovereign power of eminent domain could not be exercised in its favor. This ought to be conclusive of the question. But it is said it is not *such* a public purpose as will support taxation. Strange indeed ! The power of eminent domain is limited in its scope and operation to but few subjects. At every step it is traversed and opposed. Everywhere the plea of inexorable necessity must be interposed in its favor, or its progress is ended. Not so with taxation. As we have already seen, taxation is·the most universal, broad, sweeping, and unlimited power possessed by governments. It is the power to destroy, and has no limit except in the will of the sovereign. (Per Marshall, C. J., in *McCullough* v. *Maryland*, 4 *Wheat.*, 316–425.) No instance has been shown, nor can be shown, where the government may aid a thing by the power of eminent domain, where it cannot also aid it by the power of taxation. No instance has been shown, nor can be shown, where the government may aid a thing by the exercise of any of its sovereign powers, where it may not also aid it by taxation."

This argument in support of legislation in aid of railways is insurmountable to those who contend to the contrary ; and it is interesting to see the attempts made to overcome it. In *Hanson* v. *Vernon*, the Court says, by way of argument, " The Iowa statute authorizes any person or corporation designing to construct a canal, or

HALLENBECK *v.* HAHN.

a railroad, or a turnpike, graded, macadamized, or plank road, or a bridge, as a work of public utility, although for private profit, to take such reasonable amount of private real estate as may be requisite for a right of way, not exceeding one hundred feet wide, upon paying therefor," &c. The author of the opinion then remarks, " Can the legislature tax the citizen, and compel him to assist any person or corporation designing to construct such works for private profit? Who is bold enough to claim it? I deny that it can be done. The property that can be taken by the exercise of the right of eminent domain is restricted to the actual amount required to execute the undertaking, and is generally limited to one hundred feet in width; and full value in money must be paid. But the amount of tax that may be levied is limited, and no return or compensation to the tax-payer is contemplated." For the Court to say, that, while private property may be taken for the works enumerated, a tax for the same purpose cannot be upheld, is a mere *petitio principii.* Although the gain or profit, if any, may go to a private corporation, the work is public in its ends and objects, or why can private property be taken? The highway, railroad, or plank road, if built through the exercise of the high sovereign prerogative of taking private property, becomes public, and subject, to a large extent, to public control. The State demands that it be free to all, that the rate of toll may be governed and fixed by it, and that no discrimination be made as against any person. For a purely private road or bridge, the right to take private property does not exist. If the road be of so public character, then, as to warrant despoiling the property of the individual citizen; if the public necessity for roads be so great as to demand this, — why not aid it still further by public tax? But the Court says, in effect, that the

citizen whose specific property is confiscated receives pay, and the one whose property is taken as tax receives none. This is standing the pyramid on its apex. It has always been thought that nothing but inexorable public necessity would drive a man from his hearth, lay waste his trees and ornaments, upon which fancy, affection, or association, had placed a value beyond any sum that could be fixed in the manner the law provides. It is now intimated that the pay received is a controlling consideration. The remark, that, in taxing for the support or introduction of railroads, " no return or compensation to the tax-payer is contemplated," is entirely unfounded, in my judgment. A return or compensation is contemplated to the tax-paying public when the sovereign prerogative of the right of eminent domain is conferred upon railroad companies ; but, from the nature of the thing, only those tax-paying citizens whose property is taken are called upon to contribute. But that same public benefit which justifies the exercise of the right of eminent domain is the return or compensation contemplated for the tax-payer. If, by " return or compensation," the learned judge means actual money paid back, then no tax is valid, as it is never paid as an investment. If by the expression is meant a return of public benefit, then the return is the same as that arising from money paid for opening and repairing common highways; only the return is greater in the one case than in the other. By the one, persons, rich and poor, can transport themselves or freight in one-third of the time, and at one-third of the expense, it can be done by the other.

As the Michigan Court displays more boldness in its rejection, so it shows more originality in the application of old principles of law. In answer to this same objection, this Court says, " Every man has an abstract

Hallenbeck *v.* Hahn.

right to the exclusive use of his own property, for his own enjoyment, in such manner as he shall choose; but if he should choose to create a nuisance upon it, or to do any thing which would preclude a reasonable enjoyment of adjacent property, the law would interfere to impose restraints. He is said to own his private lot to the centre of the earth; but he would not be allowed to excavate it indefinitely, lest his neighbor's lot should disappear in the excavation." After giving other illustrations of the maxim, "Enjoy your own property in such a manner as not to injure that of another person," the Court goes on to say, "Eminent domain only recognizes and enforces the superior right of the community against the selfishness of individuals in a similar way. Every branch of needed industry has a right to exist, and the community has a right to demand that it be permitted to exist; and if, for that purpose, a peculiar locality, already in possession of an individual, is essential, the owner's rights to undisturbed occupancy must yield to the superior interest of the public."

Why this argument is introduced, unless it be to found upon it the point, that property thus taken is not taken solely under the inherent right in sovereignty to take property of the citizen when it is deemed for the benefit of the public, I do not know. But I confess, while I can understand why one citizen, in digging on his own lot, should not undermine his neighbor, or conduct the business of slaughtering in the heart of a city or town to the offence of surrounding citizens, or do any other act positively offensive or damaging, in violation of the maxim, *Sic utere tuo,* I cannot comprehend why a farmer, in the peaceful enjoyment of his land in the country, offending no one, should yield his property for any strictly private enterprise, whether it be to build railroads on it, or to locate a dance-house thereon.

27

### HALLENBECK *v.* HAHN.

The author of the opinion, in the case of *Commissioners of Leavenworth* v. *Miller*, *supra*, says of this same argument, " There has been a half-expressed, half-suppressed claim, that the right cf eminent domain is not exercised in favor of railroad corporations because of their public character, but that it is exercised under the maximum, *Sic utere tuo ut alienum non lœdas*. This is comic as well as novel. Because a man must so *use* and *enjoy* his own property so as not to injure the rights of others, it is claimed that he may be totally deprived of its use, and must allow a *strictly private corporation* (as is claimed) to take possession of it, and use and enjoy it."

In the Salem case, we discover what would seem to be the rule laid down to guide courts in determining what they will permit the legislature to allow taxation for, and what they will forbid. The Court says, " We perceive, therefore, that the term ' public use,' as employed to denote the objects for which taxes may be levied, has no relation to the urgency of the public need, or to the extent of the public benefit which is to follow. It is, on the other hand, merely *a term of classification to distinguish the object for which, according to settled usage, the government is to provide, from those which, by the like usage, are left to private inclinations.*"

At the hazard of appearing stupid, we must again confess our inability to comprehend the rule. Where must this usage be settled? Not in a new State like ours; for we have to pass our first laws to begin. Then to what State or county look for this settled usage? and what constitutes such usage? If passing laws by the legislature, authorizing municipal aid to private corporations, under a constitution no more restrictive than ours, and their validity being upheld by the courts, constitutes a settled usage, we can refer to Connecticut,

HALLENBECK v. HAHN.

Georgia, Kentucky, Maine, Missouri, Mississippi, Illinois, Indiana, New York, South Carolina, Iowa, Kansas, and a number of other States, where this has been done. If it is answered that this usage has not existed long enough, I can only say, that it runs back to near the time of building the first railroad; and it can hardly be demanded that laws should have been passed a century before, in anticipation of their discovery or invention. It has always been regarded the duty of government to furnish accommodation or facilities for travel and commerce; but should the public be denied the advantage of railroad communication, because, before their introduction, usage had settled upon common highways, or be compelled to wait till private interest supplies them? Left to private inclination or interest, it is safe to say that not one mile of the twelve hundred miles of railroad which traverse this State to-day would have been built without local or government aid. What would be the condition of Nebraska, as respects the wealth, population, and comfort of her people, I will leave others to estimate, reference being made to States with and without railroads, as well as to those parts of our own State which are and which are not traversed by them. Governments are the subjects of growth and improvement. If the doctrine here enunciated had obtained at an early period, and each succeeding generation had been forced to confine its governmental power to the bands which confined its predecessors, we should be wanting many of those facilities, conveniences, and comforts provided by government at the present day. Again: what are proper objects of public support has been determined differently by different governments, governed by interest or the peculiar views of the majority. So the rule here proclaimed is so uncertain in its application as to afford us really no aid.

HALLENBECK v. HAHN.

The different conclusions reached in declaring rail-road-aid bonds invalid are only limited by the number of cases. In *Hanson* v. *Vernon*, the law under which the bonds were issued was found to be in violation of an express section of the Iowa Constitution.

Under a constitution quite similar in Michigan, the Court found no section of the constitution violated; but, differing with the legislative and executive departments of that State as to the true theory of government, it decided in its own favor, and enforced its judgment by declaring the bonds invalid.

In the third case, *Whiting* v. *The Sheboygan Railroad Company*, determined by the Supreme Court of Wisconsin, the Court seems oblivious of the existence of a constitution in that State, as it makes no reference to it, but concludes that bonds donated to a private corporation are invalid, while bonds issued in payment for stock subscribed for by the municipality may be good. In other words, the public may put its hand into A's pocket and take out money, and, against A's will, compel him to engage in railroading; and at the same time it cannot donate the same money outright to the company. No other reason is given than that, "to the extent of the stock subscribed, the municipality *owns* the road, and it may be said to be *public* property." The road, as an entirety, is no more or less public because a municipal corporation owns stocks. It may share profits or loss like an individual. The officers elected to control the road, under the charter, will not be public officers. The road subserves no greater public end with county subscription to stock than without it. This distinction has no leg of principle to stand upon, and is approved by none, but is expressly repudiated by even those who maintain the invalidity of this kind of bonds generally. Judge Brewer, who dissents from the opin- ·

HALLENBECK v. HAHN.

ion of the majority of the Court in the Kansas case, says, "A law which compels a citizen to invest his means, whether little or much, part or all, in a railroad enterprise, even though it secure to him a share in the profits of the enterprise, trespasses on his uncontrollable right to invest his means in any business he chooses."

Thus I have hastily glanced at the decisions of the courts of last resort of the three States that have pronounced railroad bonds invalid. They follow no cases, are followed by none, and disagree among themselves. The case of *Hanson* v. *Vernon* has been overruled and set aside in the State of Iowa. The case of *Whiting* v. *The Sheboygan Railroad Company* in Wisconsin, with its qualified opinion, establishes no principle. This leaves the Salem case in Michigan to "stand out," in the language of Judge Swayne in *Gelpcke* v. *Dubuque*, 1 *Wall.*, 205, "in unenviable solitude and notoriety." This case stands opposed (making the statement upon the authority of a brief of one of the counsel before me, and I have examined many of the cases myself) to no less than ninety-three cases in the supreme courts of twenty-six States, and thirty-five cases in the Federal courts, affirming the validity of such securities as these, under constitutions, in almost every instance, with provisions more specific and stringent than ours. The case was decided by a divided court. So revolutionary in its character is it regarded, that, in several cases determined since in other States on the same question, it is expressly condemned. The United-States Court, which makes it a rule to follow the construction placed upon a statute or the constitution by the State courts, refuses to obey the rule with respect to this decision. The Circuit Court for Michigan at once came to the rescue of the financial credit of that State, and of the holders

HALLENBECK *v.* HAHN.

of railroad-aid bonds who were stricken down by the decision in the Salem case, and, in the case of *Talcott* v. *The Township of Pine Grove* (*Bench and Bar*, vol. i., Nos. 3 and 4), condemns the Salem case, as not only opposed to the well-settled law as established by the courts of the different States as well as the Federal courts, but opposed also to the settled law of Michigan. The opinion was delivered by Judge Emmons, and is most able and exhaustive. The decisions are so numerous and so uniform, " that the rule here laid down pervades the jurisprudence of the United States." *Rogers* v. *Burlington*, 3 *Wallace*, 663. The opinions, in many of the cases, are marked by the profoundest legal ability. Their reasoning is unanswerable. But, whatever conviction I might have, I should hesitate long before opposing such an array of authority : indeed, I should have no right to do so. Legal principles are fixed by long-recognized and uniform repetition. Rights grow up on the strength of principles so established. The rule, *stare decisis*, is binding on the Court. Not only should this Court follow the line of authorities in the interpretation of our constitution, but it should follow the interpretation put upon it and as understood by the people of the State.

When our constitution was adopted, a score of States, with constitutions quite as restrictive as ours, had passed laws like the Act of 1869. The courts of the several States, as well as of the United States, had uniformly held such laws constitutional. Copying these constitutions, we adopted the interpretation which had been given them. That this interpretation was so accepted is evinced by the enactment of the law itself. In further proof that the construction so given it by one legislature is in accord with the views of the people, successive legislatures, fresh from the people, have

permitted it to 'stand. In further corroboration that this construction harmonizes with the views of the people, and that the people regard the bonds issued as having the sanction of law, the Constitutional Convention which assembled in the summer of the year 1871 submitted the following with the new constitution then framed: " No county, city, town, township, or other municipality, shall ever become subscribers to the capital stock of any railroad or private corporation, or make donation to, or loan its credit in aid of, such corporation; provided, however, that the adoption of this article shall not be construed as affecting the right of any such municipality to make such donation where the same has been authorized, under existing laws, by a ·vote of the people of such municipalities prior to such adoption." This, together with the entire proposed new constitution, was rejected. But the proposition itself, by the most direct implication, assumes that the old constitution is sufficiently broad to cover the Law of 1869. This is enforced by the express proviso, that bonds issued prior thereto are valid. The people, by the rejection of this proposed denial of the right to the legislature to authorize such bonds, whether in subscription for stock, or donations, maintain the existence of such right in the legislature. In view of all this, we cannot annul the Act of 1869. We should not be asked to do so. It is but appealing to us to rise superior to the legislature, the executive, and even the people themselves, and usurp a power never given us. Having faith in the integrity of the courts of this State, and believing that they are no wiser than the sages who have settled the law by these numberless opinions, persons have invested in these bonds; and they are now in the hands of innocent, *bona-fide* holders. We have received their value. The growth and prosperity of

HALLENBECK v. HAHN.

the State is largely owing to the capital thus induced; and a regard for the fearful consequences which must follow an adverse decision should lead us to give no willing ear to such appeals. The plaintiff may feel aggrieved. This law, like countless others, may work comparative injustice. But with the mass of the people of that county — a county whose superior rank in wealth is so largely indebted to the introduction of railroads — these obligations are held sacred. They, in common with the mass of people of the State, would shrink from the remotest suggestion of repudiation. They would gladly be saved from a decision against the validity of this class of obligations. The cloud that must fall upon Nebraska's credit, in her infancy, from the importation of " repudiation," would be crippling to her prosperity, and disgraceful to her citizens. We must rely upon the energy and integrity of our people. Our State is full of native wealth lying in her soil and climate. Productions are almost worthless without bringing the soil alongside of the market. This requires capital. Capital leaves where good faith is wanting. I have the highest faith in the good sense of the people. When they shall discover that subsidizing railroads is detrimental to the interests of the State, like the people of Illinois and of some other States have done, they will prohibit it by an amendment of the constitution. But, with the constitution as it is, we can only declare the Law of 1869 constitutional; and finding that the bonds were properly issued, in accordance with an overwhelming vote of the county in their favor, they are declared valid.

We pass next to consider some of the other numerous objections made against the tax levied upon the property of the plaintiff in error. These consist of averments of alleged irregularities in the assessment of his

Hallenbeck *v.* Hahn.

property in the levy of the tax, and in its attempted collection. In the consideration of them, it must be borne in mind that we are sitting, as far as this case is concerned, as a court of equity, and not as a court of law, to review and correct errors in that regard. We are to do justice to the plaintiff, and exact the same of him. If any irreparable injury is about to be done him, such as cannot be righted in a court of law, we may interfere. But, from the allegations of plaintiff's petition, it is admitted that he is the owner of a large amount of real and personal property. We also know that the government must be kept up, roads must be repaired, bridges built, schools supported, and the very courts whose services he has commanded must be sustained. To do all this requires an annual levy of tax; and the plaintiff should pay such portion of it as the value of his property bears to the aggregate of taxable property. To ascertain the amount of taxable property, to levy the required tax, and collect it from the thousands of taxable inhabitants, involves numberless steps, and the services of various officers more or less deficient in the qualities necessary to a proper discharge of their several duties. That many mistakes and irregularities should attend all this is more than likely. Many of these are *harmless*. When otherwise, a vigilant person can effect a timely correction. If his property is assessed too high, application can be made to the Board of Equalization for reduction. Other illegal proceedings, as has been held by this Court, may be corrected by proceedings in error. Whatever, as a court of law, we may be constrained to hold when trying the title to property based on a sale for taxes irregularly levied, as a court of equity our concern is as to the ultimate right of the matter. Here, as we have said, the plaintiff confesses to the ownership of a large amount of prop-

erty on which a tax should be paid. That the tax-list for the year 1870 has no seal impressed on it; that there is no evidence filed with the county clerk as to the time when the assessment-list of the precinct wherein the plaintiff's lands lie was returned or deposited, and objections of a like technical character,— do not necessarily prove that the tax assessed against the plaintiff is not just. The complaint that church property of the county is exempt from taxation, and plaintiff's proportion of tax thereby increased, is untenable. This is in accordance with universal custom; and the right to do so is nowhere denied in the authorities. *Cooley's Con. Lim.*, 514; *High on Inj.*, sect. 358; *Muscatine* v. *Mississippi, &c.*, 1 *Dillon's C. C.*, 536.

If it be true that the commissioners of the county did not sit the full three days required by statute to equalize assessments, the objection is but technical as put forward here. It is not claimed that the plaintiff's property is assessed beyond its true value; or that he attempted or desired to appear before the Board of Equalization, and was prevented from doing so by their failure to sit the prescribed time. More than this: in any event, if, for this or for any other reason, he is called upon to pay a tax larger than he in justice ought to pay, he must at least conform to that first rule of equity, and offer to pay the amount justly due from him, before he can ask to be relieved from the payment of the balance. This offer he nowhere makes; and, for this reason alone, he should be turned from a court of equity. *Story's Eq. Jur.*, sect. 64, *e; High on Inj.*, sect. 363; *Hersey* v. *Supervisors, &c.*, 16 *Wis.*, 185; *Bond* v. *Kenosha*, 17 *id.*, 284; *Mills* v. *Johnson, id.*, 589; *Palmer* v. *Napoleon*, 16 *Mich.*, 176; *Taylor* v. *Thomson*, 42 *Ill.*, 10; *Board of Commissioners* v. *Elston*, 32 *Ind.*, 27. Although the revenue-law does not permit the treasurer

HALLENBECK v. HAHN.

to accept of only a part of the tax levied, yet this does not discharge the party from the duty of making the offer to the Court, which is not so restrained. But neither in the petition nor in the argument has the plaintiff expressed a willingness to pay any part of the tax, but defiantly seeks to avoid it all, asserting every objection, down to the most trivially technical.

Notwithstanding, then, the various objections urged against the proceedings of the precinct assessors and of the county commissioners, which have resulted in the determination of the sum the plaintiff should pay as his proportion of the tax levied, there is nothing which shows to the Court that it is unjust or inequitable that he should pay the sum demanded ; and with any of the objections against the manner of assessing his property, or the like, we have nothing to do in this action.

I have looked at but few of the numerous authorities cited in support of the several objections urged by counsel. From those I have examined, I am satisfied that most, if not all, relate to actions of ejectment, trespass, or other purely legal cases. While the authorities are not entirely uniform, the rule seems to be pretty generally established, that equity will not interfere by injunction to restrain the enforcement of tax proceedings on the ground of irregularities or errors in the assessment of the tax, or in the execution of the powers conferred upon taxing officers ; the remedy at law being deemed sufficient in such cases. *High on Inj.*, sect. 355 ; *Clinton, &c., Appeal,* 56 *Pa. St.,* 315 ; *O'Neal* v. *Virginia, &c.,* 18 *Md.,* 1 ; *Livingston* v. *Hallenbeck,* 4 *Barb. ; Macklot* v. *Davenport,* 17 *Iowa,* 379 ; *Center, &c., Co.* v. *Black,* 32 *Ind.,* 468 ; *Warden* v. *Supervisors, &c.,* 14 *Wis.,* 618 ; *Kellogg* v. *Oshkosh, id.,* 623 ; *Exchange, &c.,* v. *Hines,* 3 *Ohio St.,* 1 ; *Jackson* v. *Detroit,* 10 *Mich.,* 248 ; *Williams* v. *Mayor, &c.,* 2 *Mich.,* 560 ; *Greene* v.

*Mumford,* 5 *R. I.,* 472; *Schofield* v. *Walkins,* 22 *Ill.,* 66.

Upon a question of the importance and general interest of this, coming before this Court for the first time, I may be pardoned for incorporating in this opinion some of the arguments of other courts in support of the position here taken.

In *Chicago &c.,* v. *Frary,* 22 *Ill.,* 34, Mr. Chief Justice Caton, in stating the grounds upon which relief is refused in cases of irregularities attending the assessment of property and the levy of taxes, says, —

" We have in this case been called on to inquire in what cases the power of a court of equity may be exercised to restrain the collection of the revenue of the State. The decisions of this Court show, that, in a large majority of the cases involving the regularity of the proceedings for the collection of the revenue, we have met with irregularities in the proceedings to such an extent as to destroy the titles to real estate acquired at tax sales. In this way has a court of common law afforded a remedy for irregularities in the execution of the revenue-laws. The same and even additional redress is afforded to parties whose personal property is seized for a tax illegally assessed. If, in all these cases, the Court of Chancery had taken the matter in hand, and examined the regularity of the proceedings, whenever an attempt was made to collect the revenue and restrain its collection, if it were shown that the law had not been complied with in the assessment of the taxes, the result would have been, that, in many if not in most cases, the collection of the revenue would have been enjoined, and taxes would not have been collected. Under such an administration of the laws, with so complicated a revenue system as ours, rendered so by a tender regard for the rights and interests of the citizen, no government

HALLENBECK v. HAHN.

could exist for a single year. Let us now, by sustaining this bill, stretch out the strong arm of this Court, and stay the hand of the collector in any case where any irregularity can be shown in the assessment of the revenue, and a flood of injunctions would be spread over the land at once. State and county revenue would cease to be collected, at least till the termination of protracted litigation, and the wheels of government would stop. It is no answer to say, 'Let those whose duty it is to administer the revenue-law do it with greater care, and do every thing which the law requires, and at the time specified, and be careful that they do no more than is required.' We must take things as they are, and look at practical results. Neither precedent nor reason will warrant the use of the writ of injunction for such purposes, and to produce such results. Where the law affords an adequate remedy, this writ cannot be used; and, especially where greater mischief will flow than good result from it, the Court will always withhold this species of relief. Equity cannot attempt to prevent, any more than it will redress, all wrongs. It is not in ordinary but in extraordinary cases that this writ is properly invoked. If the law can redress the wrong, if it can repair the injury, equity must suffer it, and let the courts of law redress it. This is the general rule, to which there are no doubt exceptions, and exceptions, too, in cases of the collection of taxes. Those exceptions are confined almost if not entirely to cases where the tax itself is not authorized by law; or, if the tax itself is authorized, it is assessed upon property which is not subject to tax. . . . Where an injunction has been finally sustained, it will generally, if not always, be found to be of this class. It is possible that cases may sometimes be found where this distinction has been disregarded from inadvertence, or from the peculiar circumstances

connected with them.   We can find no other basis for
a reasonable and practical distinction.   If we permit
the injunction to be issued where the tax is authorized
by law, and the thing taxed is liable to that tax, there
is no stopping-point short of enjoining all taxes when-
ever an irregularity has intervened.   This power the
Court of Chancery has never assumed, nor could it with-
out the most disastrous consequences to the State."

*Macklot* v. *City of Davenport,* 17 *Iowa,* 379, was a case
brought to enjoin the collection of a tax where the
party had been improperly assessed too high.   In dis-
approving the course of resorting to courts of equity to
enjoin the collection of taxes, Mr. Justice Cole, in speak-
ing for the Court, among other things, says, —

" The correct and, we believe, the ordinary method of
fixing the rate of tax necessary to be levied in any given
year, for a city, county, or a state, is, first to ascertain
the amount or assessed value of the property in such
city, county, or state, and then ascertain the amount
of revenue necessary to carry on the government for
which the tax is to be levied; and from these *data,* which
ought, for the safety of such government, to be fixed
and certain, the rate is easily and certainly determined.
But suppose, that after such rate has been fixed, and the
levy made accordingly, every tax-payer is at liberty to
controvert the correctness of his assessment, and, when
the collector calls for his tax, he may enjoin the collec-
tion on the ground of error in the assessment, and liti-
gate the question for a series of years, even the ordi-
nary pendency of equity causes, — and in many cases
such litigants would doubtless be successful, whereby
the collection of the revenue would be indefinitely
delayed, and greatly reduced in amount, — what would
become of the government ? how, in the mean time,
would our schools and charitable institutions be sup-

HALLENBECK v. HAHN.

ported? and in what manner could the executive, legislative, and judicial departments of such government be kept in healthful and successful operation? To hold that such course could be pursued would be to hold that the government had provided for its own strangulation at the hands of one of its departments.

" Again: it is a well-recognized fact, that more or less error has always been connected with the assessment, levy, and collection of taxes. This fact finds abundant verification in the almost universal failure and insufficiency of tax-titles. This has been true, not only of Iowa, but of every State in the Union. This insufficiency of tax-titles has resulted from the errors and irregularities in the assessment, levy, and collection of taxes: and, if a tax-payer may enjoin the collection of the taxes for an error in the assessment, he may enjoin for any other error; and to sustain such injunction, and to hold that taxes may be enjoined for errors and irregularities, would result in a flood of injunctions all over the land, and stay the collection of revenue to the bankruptcy of every government, city, county, or state."

Expressions like those contained in the foregoing quotations might be multiplied at great length; but I will pass to consider an objection dwelt upon by counsel for plaintiff, and upon which the Court is divided.

At one of the more recent sessions of the State legislature, the revenue-law of 1869 was so modified as to direct the treasurer, in the collection of taxes, to first proceed against the tax-payer's personal property before offering to sell his lands. *Laws of* 1871, p. 81. The petition in this case avers that the plaintiff is possessed of abundant personal property out of which to make the tax; and, for this reason, asks that the treasurer be enjoined from selling his lands. The demurrer admits, of course, that he has the personality as claimed. To

HALLENBECK *v.* HAHN.

obey the law, then, the treasurer should first proceed against that.

It is not necessary to stop and consider what may come from his disobedience. It may be suggested that sect. 4 of the same law subjects an officer, for the neglect to discharge any duty devolving upon him in the collection of taxes, to the payment of one hundred dollars. It further occurs to me, that if it is true in fact, as admitted by the demurrer for the argument, that the plaintiff has plenty of personal property to satisfy the tax demanded, there will be no bidders for plaintiff's land; or, if sold, that a questionable title must follow. If the title fails, the treasurer or his bondsmen, under another section of the same law of 1871, will be liable for the amount of tax so improperly collected.

All this, or even more, may befall the treasurer for failure to discharge his duty. But how does it help the plaintiff's standing before a court of equity? He appears here the admitted debtor to the government, which he should help to sustain for the amount of tax levied against him. He is shown to be the owner of lands; admits that he has an abundance of personal property; and no doubt has money in his pocket to pay his tax, as he must have to fee lawyers to resist it. Yet he asks this Court to aid him in his effort to avoid its payment by holding that it should be made out of one kind of property rather than another, — to say that the treasurer's neglect may serve as his excuse for not paying his just indebtedness. If he has such an abundance of personal property as will satisfy this tax under a forced sale, it is very certain that it can be better sold or pledged by himself to obtain the money than it could be by a public officer. To me it would have the appearance of trifling to permit the plaintiff to shield himself behind this supposed technical advantage to avoid discharging his just

HALLENBECK *v.* HAHN.

obligation to the public.  If this were a void tax, or
if the plaintiff's property was exempt, or, for like rea-
son, no tax was due from him, and the title to his realty
was in danger of being clouded by this sale, we might
interfere.   But there is nothing of that in the case, —
nothing which brings it under any head of equitable
cognizance.   The tax is due ; and common justice de-
mands that it should be paid.   With the manner of its
collection we have nothing to do.   The plaintiff may
save both his personal and real property by paying a just
claim.   If he refuses to do this, it is of little concern to
us, as an equitable question, whether the treasurer sell
the real or personal property ; or whether he throttle
the plaintiff, and force him to perform his duty to the
government which protects both him and his property.

The judgment of the Court below must be affirmed.

JUSTICE LAKE concurs.,

MASON, Ch. J., dissenting.

John Hallenbeck, the plaintiff in this case, filed his
petition in the Douglas-county District Court on the
eighteenth day of September, 1871, against the defend-
ant, W. J. Hahn, who is county treasurer of Douglas
County.

The object and prayer of the petition was to restrain
the defendant, as such treasurer, from selling certain
real estate of which plaintiff was owner in possession,
lying in Douglas County, and fully described in the
petition, to set aside the levy and assessment for the
year 1870, and for damages and costs.   The grounds
upon which this relief is claimed are very voluminously .
set forth in the petition.   After stating that the defend-
ant is county treasurer of Douglas County, and, acting

as such treasurer, is about to sell said real estate for the alleged reason that the taxes due thereon for the year A.D. 1870 are unpaid, the plaintiff proceeds to set forth, that on the thirtieth day of November, 1869, a proposition was submitted by the county commissioners of Douglas County to the electors thereof, to issue a voluntary donation of three hundred and fifty thousand dollars, in county bonds of the county, to certain railroad corporations to aid in their construction.

The proposition, the canvass of the votes cast on the proposition, the resolution of the county commissioners after the canvass to issue the bonds in accordance with the vote, and the notice of such resolution published by them, are all fully set out in the petition; and various alleged irregularities in those proceedings are specifically set forth, besides those which appear upon the face of the proceedings.

The petition further shows that the tax for which the defendant proposes to sell the plaintiff's real estate is, in part, to pay the interest on those bonds.

I do not regard it necessary to consider in detail, nor indeed to consider at all, the soundness of the various objections made by plaintiff of the validity of the tax levied to pay the interest. The conclusion which I have come to renders such consideration unnecessary, if not improper.

Grave and serious questions were raised by the plaintiff's counsel on this point, which deserve, even at this time, a passing notice.

Had the plaintiff relied solely upon the fact, that the tax for which defendant was about to sell his land was to go in part to pay the interest on the bonds so donated and issued to these railroad corporations, the Court would have been called upon to consider these questions, which would then have been as vital and important to

the plaintiff's case as they are vital and important in themselves. It would then have been a vital question, whether these are limits to the taxing power which are not expressed or implied in the provisions of our constitution. It might also have been a question, whether the legislature may delegate a power which it may not itself exercise; whether the legislature may delegate to the various counties and municipalities of the State the power to contract debts, and loan their credit to aid in the construction of railroads, when the whole State is restrained from so doing by constitutional inhibition. I understand it to be at least doubtful, if, under our present constitution, a statutory enactment donating the bonds of a county to a private corporation, and providing for their payment by a tax upon the property and inhabitants of such county, would not be absolutely null and void. If this be true of the legislature, — of the head and source of the taxing power, — I am unable at this time, from any argument I have yet heard, to see why it is not, for a stronger and greater reason, true of those to whom it has delegated, or attempted to delegate, its authority.

I am clear that there are no limits to the taxing power except those fixed by the constitution. For, granted, as an abstract of principle, that a tax should never be laid except for government strictly so called; yet, before the taxing power can be subject to the control of the courts, we must be able to define with judicial precision what the object and purposes of government are. And who will undertake to do this? This power is committed to the legislature, itself subject to the restraint imposed by the constitution. If we seek to give to government a purely regulative character, — and, by that, its object is to secure the protection of its individual members, — what shall we say of the laws

establishing and levying taxes for the support of our common schools and universities, of the premiums awarded by government for various kinds of excellence in labor and invention, all clearly of a different character? Whatever may be true in the abstract and as a philosophical principle, it must be admitted as a fact, that the purposes of government are varied and infinite, all tending to one end; namely, the well-being of society. What will best secure this is a political, not a judicial, question. And the power of determining what is for the well-being of society is committed to the wisdom and judgment of the legislature, with no limitations or restrictions except those imposed by the constitution. It may, then, be laid down as a principle, in no case to be departed from, that when the legislature has by enactment of its own, or of those to whom it has lawfully delegated its authority so to do, provided for levying and collecting a tax, courts have no right to interfere and inquire whether the taxing power has been legitimately exercised. The legislature is the exclusive judge in such cases, unless they be restrained by constitutional limitation. In that case the Court acquires jurisdiction to restrain and confine the legislative enactment within the limits prescribed by the constitution.

But the latter question is, to my mind, of greater difficulty, and involves considerations much more serious. Certainly, if the legislature may delegate a given power to the electors of a county, it may exercise that power itself. This will be conceded by all. The legislature, being desirous to consult the will of the electors of that locality which is to bear the burden, assigns to them the decision of the question, whether or not money shall be borrowed for a given purpose, and a tax levied to pay the debt thus created. It is the

act of the legislature, nevertheless; and possesses the same validity as if done by the legislature, and no more. If it, then, be admitted that the courts have no authority to define the limits of the taxing power, only two questions can be raised here; namely, May the legislature, under our constitution, delegate its authority to borrow money and contract debts? Second, if it may do so, are the debts thus contracted by county, state, or public, debts in such a sense as to come within any of the limitations of the finance article of our constitution? Or, in other words, is this class of debts and obligations, contracted by counties and municipalities, by legislative authority, to make a present and gift to a railroad company, obnoxious to any provision of our present constitution? I have thus defined what I conceive to be the real issues involved in our branch of this case. But I am not prepared, nor do I think it entirely proper as the case now stands, to give an opinion upon them. They are destined, without doubt, at no distant day, to be raised and decided in this Court, when they will receive that grave consideration which their importance demands. Nor am I disposed at this time to inquire into the alleged irregularities in the voting of this debt and the accompanying tax. If these irregularities are substantial, they are fatal; if merely formal, it is otherwise.

It is sufficient for the decision of this case that it is alleged in the petition, and admitted by the demurrer, that, at the time and ever since the tax became due, the plaintiff was possessed of ample personal property and effects in this county, out of which the tax might have been collected.

The allegation is in general terms: but it is sufficient; and, if it were not, the defect could not be reached by general demurrer. Such a demurrer admits the truth of the allegation in all its breadth.

## Hallenbeck *v.* Hahn.

Our statutes provide (1870, 1871, p. 81) that the county treasurer shall first proceed to make the tax out of the personal property of the delinquent.

The question, then, is, Will the Court enjoin the county treasurer from selling the real estate of the delinquent when said delinquent has personal property out of which the tax may be collected?

The power, or rather duty, of the Court to interpose by injunction to restrain the collection of a tax, has been variously decided in different tribunals; and the authorities are somewhat conflicting. In *Ottawa* v. *Walker*, 21 *Ill.*, 605, the power was exercised when the tribunal levying the tax acted without authority of law. So in *Burnet* v. *Cincinnati*, 3 *Ham.*, a sale of land for a tax which had not been assessed in accordance with the charter and ordinances of the city was restrained; and this case was cited, commented on, approved, and followed, in *Culbertson* v. *Cincinnati*, 16 *Ohio*, 574. So in *Kennoup* v. *Boling*, 11 *Cal.*, 380, a sale of real estate for a valid tax was restrained, because the officer selling had no authority to sell, his term having expired.

On the other hand, it is laid down in numerous cases, that, when nothing but the mere question of taxation is involved, the issue is strictly out of law, and equity can take no cognizance thereof; that a party aggrieved by an illegal tax has an ample subsidy at law, and a court of equity has no authority to restrain the collection of an illegal tax; that the unlawful collection of a tax is a mere trespass, not to be enjoined without allegations and proof of impossible injury therefrom. 23 *Conn.*, 232; *Mintons* v. *Hays*, 2 *Cal.*, 590; *Wilson* v. *Mayer, &c.*, 4 *E. D. Smith*, 675: *Ritter* v. *Patch*, 12 *Cal.*, 298. As the announcement of an abstract principle, I do not know that the doctrine above laid down is open to objection.

It is not in the general principle that ought to govern

that the various tribunals have differed from each other: the point of difference is to be found in the application of the principle. No court has ever interfered when the issue was conceded to be one of mere taxation. Irreparable injury without adequate remedy at law has always been the ground of equitable interposition.

The question to be decided here, as in all other cases, is, Is the injury irreparable in the judicial sense of the term, or the remedy at law adequate? Suppose the tax to be in all respects legal, and all proceedings in relation thereto up to the time of collection valid and regular: should the treasurer then, in disregard of duty enjoined on him by law, without making an effort to collect the tax out of the personal property of the delinquent, proceed to sell his real estate therefor? What is the nature of the injury that will ensue? and where and what is his remedy at law? The power to collect taxes is a high sovereign prerogative; and it is in accordance with the spirit of our institutions that its exercise should be strictly confined within the limits prescribed by it.

To say that the treasurer, though required by law to exhaust his remedy against the personal property of the delinquent before proceeding to sell his real estate, may nevertheless disregard this limitation upon his power, and proceed against the real estate in the first instance, is to frustrate and make void the law, instead of administering it. A cloud is thus cast upon the plaintiff's title: a deed thus given may ripen in time into a perfect indefeasible estate; and the plaintiff, though in no fault, may be deprived of his title and possession by the illegal and wrongful acts of a petty officer. Whether this is an irreparable injury or not is to be left to each one's own consciousness and sound judgment in the absence of decisive authority; but I, for one, see no room for two opinions.

HALLENBECK *v.* HAHN.

In such cases the question is not one of mere taxation, and never can be. Courts of equity interfere when one sets up and asserts a colorable title, and will enjoin him from so doing. Shall they not also interfere when an attempt is made to create one, and especially one which, by a brief lapse of time, becomes perfect? Where is the remedy at law? I confess I am unable to conceive one. Here is no trespass for which an action will lay. The action of trespass, if it were adequate, does not lie; and, if it lay, it would be wholly inadequate. It might answer in case of personal property wrongfully seized, but not here. It has been suggested that the delinquent may pay the money under protest, and then sue to recover it back. Suppose, however, he does not want to pay it, or has not got it to pay: is the officer then justified in violating the law and his just duty? Again: whom shall he sue to recover back the money? The county or the county treasurer, or give him the option to sue either. Still, if the tax be legal and valid, may not the one thus sued set off the amount due from the delinquent for taxes? I see no valid reason why this may not be done; and, if it may, it reduces that reasoning to an absurdity. The plaintiff is clearly entitled to an injunction, unless we conclude to override the positive provisions of the law, and hold that delinquent taxes are to be collected in the best way and manner which the officer charged with that duty can devise, consulting his own good pleasure and ingenuity alone. I am not prepared to so decide. In my opinion, the judgment of the Court below should be reversed.